Filed 12/3/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S044592 |
| v. | ) | |
| | ) | |
| STEVEN HOMICK, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. A973541 |
| _____ | ) | |

Defendant Steven Homick was convicted by a jury of one count of conspiracy to commit murder (Pen. Code, §§ 182, 187)[1] and two counts of first degree murder (§ 187), as to which the jury found true financial-gain, multiple-murder, and lying-in-wait special-circumstance allegations (§ 190.2, subd. (a)(1), (3), (15)).[2] Following the penalty phase trial, the jury returned death verdicts on

---

[1] All further unspecified statutory references are to the Penal Code.

[2] Six individuals were arrested for the murders of Vera and Gerald Woodman: defendant; his brother, Robert Homick; the victims' sons, Neil Woodman and Stewart Woodman; Anthony Majoy; and Michael Dominguez. Dominguez pleaded guilty to two counts of first degree murder. Stewart Woodman and Anthony Majoy were tried together and then defendant, Robert Homick, and Neil Woodman were tried together. Stewart Woodman and Anthony Majoy were convicted of two counts of first degree murder with special circumstances and conspiracy. Stewart Woodman agreed to testify against the remaining defendants in exchange for avoiding the death penalty. Majoy was sentenced to life without the possibility of parole. Robert Homick was convicted of two counts of murder, the multiple-murder special circumstance was found true,

*(footnote continued on next page)*

the murder counts. Defendant's motions for a new trial and for a reduction of sentence (§ 190.4, subd. (e)) were denied. The trial court sentenced him to death on the murder counts and 25 years to life on the conspiracy count, which it stayed pursuant to section 654.

This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) We affirm.

FACTS

## I. GUILT PHASE

### A. The Prosecution Case

#### 1. *The Woodman family and Manchester Products*

In 1975, Gerald Woodman founded Manchester Products, which made plastic panels used in ceiling lighting. He ran the company, but ownership was divided among his two older sons, Neil and Stewart, each of whom had a 25 percent interest, and his wife, Vera, who held the remaining 50 percent interest.[3] Neil worked in production, and Stewart worked in sales. Initially, Stewart had a good relationship with Gerald, but Gerald and Neil's relationship was always acrimonious.

When the youngest son, Wayne, joined the company in 1978 after graduating from college, he was given half of Vera's ownership interest and a job overseeing accounts and credit. Neil and Stewart resented the manner in which Wayne was brought into the company. That Gerald favored Wayne over his

---

*(footnote continued from previous page)*

and he was sentenced to life without the possibility of parole. The jury was unable to reach a verdict as to Neil Woodman, and a mistrial was declared.

[3]  To avoid confusion, the Woodmans are referred to by their first names.

brothers increased familial tension. In late 1978, Gerald suffered a serious heart attack. While he was recuperating, Neil and Stewart ran the company, to their father's displeasure. Stewart testified that Gerald created problems at the company to force his sons to seek his help.

In April 1981, Stewart sought his mother's reassurance that she would support him and Neil in any conflict with Gerald. Vera said she would. A few months later, however, Vera told Stewart there was to be a meeting of the board of directors. She said Gerald had decided that Stewart would go back on the road as a salesman, Neil would be sent back to the factory floor, and Wayne and Gerald would run the company. She said if Stewart did not agree to Gerald's plan, Gerald would liquidate the business. Stewart felt betrayed by his mother.

Preemptively, Neil and Stewart issued extra shares of stock to give themselves a controlling interest in the company and then fired Gerald and Wayne. The brothers tried to buy Vera's and Wayne's interests in the company for $2.2 million to be paid over time, but the offer was rejected. A lawsuit ensued that resulted in a judgment of $675,000 to be paid by the brothers to Vera and Wayne. Neil and Stewart borrowed the money to pay the judgment owing.

The brothers also became involved in a bitter dispute involving a $500,000 life insurance policy Manchester Products had taken out on Vera to protect the interests of the family's two daughters. Vera communicated through her sister, Muriel Jackson, that she wanted the policy cancelled. When Jackson demanded they cancel the policy, the brothers refused. Neil said, "Look at the odds," and laughed.

After taking over the company, the brothers freely expressed their anger toward and hatred of their parents. Stewart testified that they would make these comments "on a daily basis" to "anybody that would listen." Former employees and business associates of the brothers confirmed that the brothers constantly

3

made derogatory remarks about their parents. These included wishing their parents were dead.

Between 1981 and 1985, Manchester Products's financial condition deteriorated. Servicing the loan from Union Bank to pay the judgment owed to Vera and Wayne was one factor. Another factor was the purchase of a new plant.

The brothers were also forced to compete against a rival company, Woodman Industries, set up by Gerald and Wayne. The ensuing price war reduced Manchester Products's earnings. Eventually, Woodman Industries went bankrupt, as did both Gerald and Wayne, and each of them lost their residences as a result. Neil and Stewart expressed satisfaction at having driven their parents into bankruptcy.

In response to Manchester Products's poor financial picture, the brothers engaged in an elaborate scheme to misrepresent the value of their accounts receivable to Union Bank, which financed the company's operations with a credit line secured by those accounts. Neil and Stewart instructed the company's controller, Steven Strawn, to manipulate the accounts receivable to make it appear that some past due invoices were still current, preventing them from being excluded from the collateral that secured the credit line. Union Bank discovered the ploy and audited the company's accounts receivable statements. Its auditors discovered $1.7 million in ineligible collateral.

### 2. *Neil and Stewart turn to defendant, their longtime acquaintance, to kill Vera and Gerald*

Neil and Stewart met defendant around 1980 in Las Vegas through a mutual friend, Joey Gambino. Stewart was an inveterate gambler who bet on "everything there was to gamble on," including football games. Defendant told Stewart that his brother, Robert Homick, who lived in Los Angeles, also bet on football games. He asked for Stewart's phone number to pass along to his brother.

4

Robert Homick and Stewart struck up a friendship based on their shared love of gambling. Robert Homick was a frequent visitor to Manchester Products. Defendant, who lived in Las Vegas, was also a regular visitor to the company and became friends with Neil.

Between 1980 and 1985, Neil and Stewart employed defendant and Robert Homick in various capacities. According to Richard Wilson, the company's one-time national sales manager, the brothers hired defendant to sweep the plant for a bugging device they feared Gerald had installed. In the summer of 1984, Neil hired defendant, as well as two former Los Angeles police officers, Jean Scherrer and John O'Grady, to act as security at his son's bar mitzvah, specifically to keep Gerald and Vera out.[4] According to Scherrer, defendant said that if Gerald and Vera appeared, "If necessary, I will waste them."[5] In May 1985, defendant enlisted Scherrer to plant a listening device in the office at Manchester Products where the Union Bank auditors would be conducting their audit. Scherrer testified the work was done when the plant was empty; defendant had keys with which they entered the building.

Stewart used Robert Homick to commit insurance fraud on two occasions. Both times, he had Robert Homick take a vehicle—the first time, a Monte Carlo belonging to Manchester Products, and the second time, Stewart's personal Rolls Royce—which Stewart then reported as stolen to collect the insurance money. Stewart also used Robert Homick to do collections for Manchester Products,

---

[4] Defendant himself had briefly been with the Los Angeles Police Department in the 1960's.

[5] Scherrer received a $25,000 reward offered for information relating to Vera's and Gerald's murders. O'Grady was deceased at the time of defendant's trial.

5

including from a company called Soft Lite. The daughter of Soft Lite's owner testified that Robert Homick had threatened to " break [the owner's] legs, or snuff out his life" unless he paid what he owed to Manchester Products.

Stewart testified that in the summer of 1983, while Joey Gambino was staying at Stewart's house, Gambino heard Stewart "screaming" and "yelling" at his parents. Gambino told him, "Stewart, you are going to kill yourself. Why don't you let me handle this, and we will put an end to it." Gambino put Stewart in touch with defendant, and the two of them, together with Neil, met at Manchester Products. Defendant told Stewart, "Joey told me there were a lot of problems going on with your mother and father. . . . You are crazy to go through it. You are not well. [¶] . . . Let's put an end to it."[6] Defendant told the brothers he would be returning to Los Angeles in a couple of weeks and suggested they "think about it" and meet again.

The second meeting took place in the first part of November 1983. At that meeting, the brothers told defendant they had decided to go through with killing their parents and asked him what information he would need. Defendant wanted information about Gerald's and Vera's "traits," including when they were together, when they were apart, where they went, and where they got together with other people. Stewart and Neil provided defendant with such information as Gerald's habit of walking the dog every night, and events like birthdays and Jewish holidays when their parents got together with the rest of the family. Stewart also provided defendant with his brother Wayne's address where, at the time, Gerald and Vera were also living. Defendant told them that killing their

---

**6**      Stewart suffered from high blood pressure and a heart problem, and had had a stroke in January 1981. He had spoken to defendant about his health issues.

6

parents would cost $40,000 or $50,000.**7**  After the second meeting, Neil told Stewart that Vera as well as Gerald would have to be killed.  He said if it was just their father, they would be suspected of it but, because Stewart had been close to his mother, if she were also killed the authorities "would never believe" Stewart was involved.  Stewart agreed.

### 3.  *Actions taken between April 1984 and June 1985 in furtherance of the conspiracy*

Defendant habitually made notes in a series of "daily reminder" books.  Police seized a number of these books for 1984 and 1985 when they searched his Las Vegas residence.  Defendant stipulated at trial that the books were his, as was the writing in them.  Defendant's notes were typically somewhat cryptic, consistent with testimony that he used codes and jargon.**8**  However, a note on April 29, 1984, included Wayne Woodman's street address, "2311 Roscomare Road, number 8."  Wayne's parents were living with him at the time.  Entries for May 3, June 4, July 1, August 4, August 5, October 1, November 1, and December 2, 1984, contained Wayne's building and unit numbers—"2311" and "8."

In late December 1984 or early January 1985, Wayne moved from Roscomare Road to 8420 Blackburn Avenue.  Gerald and Vera moved to an apartment at 11939 Gorham Avenue.  An entry in defendant's daily reminder for January 23, 1985, had Wayne's name and the notation "gas on."  An entry for

---

**7**      Stewart and Neil ultimately paid defendant $50,000 to kill their parents.

**8**      Art Wilson, a longtime associate of defendant, testified that defendant gave people nicknames and also used codes.  Joey Gambino, who testified for the defense, said defendant was "always speaking in jargon," and Gambino did not always know what defendant was saying.

February 12, 1985, had Wayne's name and the Blackburn Avenue address. An entry for February 22, 1985, noted Gerald and Vera's new address on Gorham Avenue.

Entries for August 5, September 4, October 1, November 1, and December 12, 1984, contained the notes "Ed," "Ed Bern," "grape" and "Dino." These references were deciphered for the jury through the testimony of several witnesses. Wayne Woodman testified that his father habitually carried a comb in his shirt pocket and identified a photograph of his father doing so. Leith Adams, an archivist at Warner Brothers studios, testified that in the 1950's television series *77 Sunset Strip*, an actor named Edd Byrnes played a character called "Kookie," whose trademark was that he always combed his hair with a comb he kept in the left breast pocket of his jacket. Adams testified that the character's actual first name was "Gerald," and "Dino" was the name of a restaurant on the television series.

As for the "grape" reference, the prosecution called one-time restaurateur Francis O'Brien, who in 1984 owned a restaurant in Los Angeles that served Greek food. O'Brien testified that defendant was a patron and had a particular fondness for the restaurant's stuffed grape leaves. An entry in defendant's daily reminder for September 24, 1985—the day before the murders—contained the words "Fran O" and what appeared to O'Brien to have been the phone number of his restaurant.

An entry in defendant's daily reminder for February 24, 1985, contained references to a real estate agent named Sharon Armitage, who had an exclusive listing at 11939 Gorham Avenue, Gerald and Vera's building. Defendant told his confederate Michael Dominguez that he had tried to "acquire a room . . . an apartment . . . up in the same building as the man and the lady lived with the dog" (i.e., Vera and Gerald). In June 1987, Armitage was shown a photo lineup by

8

police and picked the photographs of a man and a woman who looked familiar to her. The man was defendant.

In March or April 1984, Robert Homick told Stewart there had been an unsuccessful attempt on Gerald's and Vera's lives over Passover. Stewart was concerned because he considered Robert Homick to be a "klutz" and had specifically requested that he not be involved in the conspiracy. Robert Homick wanted $5,000 or $6,000 for expense money. Neil—who had been dealing with defendant—told Stewart to pay Robert the money. Stewart delivered the money to Robert Homick in cash at a grocery store. Stewart began to feel that defendant and his brother were simply trying to get money from them and shared his concern with Neil. Both Neil and defendant told Stewart to be patient.

June 22, 1985, was Gerald and Vera's 45th wedding anniversary. As was their custom, they went out to celebrate with other family members. Earlier in the day, two male residents of Gorham Avenue observed Robert Homick sitting in his car at different locations on the street. One of the men wrote down the vehicle license number and called the police. The police came, spoke to Robert Homick, filled out a field interview card, and left.

### 4. *Actions taken in preparation for the murders in September 1985*

Defendant recruited Anthony Majoy and Michael Dominguez as accomplices. He told Dominguez he was "going to rob . . . this olderly [*sic*] couple" and that "he had been after them a few times. Missed."

Sometime between September 10 and September 12, 1985, defendant purchased three walkie-talkies from his friend Art Taylor, who operated Art's CB Shop in Las Vegas. The walkie-talkies were for short-range communications with a five-mile maximum range and required line-of-sight contact. Defendant told Taylor he needed the walkie-talkies for surveillance work in Los Angeles.

9

Sometime in mid-September, Robert Homick and Michael Dominguez bought a boltcutter at Rae's Hardware Store in West Los Angeles. The sales clerk who made the sale identified the men from a photo lineup. On September 23, in a call to his aunt, Sybil Michelson, Stewart confirmed information he had received from Michelson's daughter Linda that his parents would be breaking the Yom Kippur fast at the home of Muriel Jackson. Shortly after talking to Michelson, Stewart received a call from Robert Homick. Stewart told him his parents would be at Jackson's residence.

On September 24, in Las Vegas, Art Taylor saw defendant's other brother, William Homick, give defendant a brown bag, saying, "[T]his is the ammo that you had requested." That morning, defendant and Dominguez flew from Las Vegas to Burbank on an 11:50 a.m. flight.[9] At the Burbank airport, defendant, accompanied by Dominguez, rented a car.

Later that day, according to Dominguez, he and defendant went to the office of a lawyer named Max Herman. Dominguez waited while defendant met with Herman. Defendant emerged from the meeting carrying a gun case. The next day, Dominguez saw the case again; it contained a revolver. Dominguez said that he, defendant, and Robert Homick tested the walkie-talkies to determine over what distance they could be used. They drove to the entrance of a gated community where Muriel Jackson lived, three or four miles from the apartment building where Gerald and Vera lived.

Defendant called Art Taylor in Las Vegas and complained he was having a problem with the walkie-talkies and wanted to know where he could buy a battery.

---

[9] The prosecution presented records for PSA airlines showing that two tickets issued for defendant and "M. Dome" were used on flight 119; defendant and Dominguez were also identified by a fellow passenger.

10

Taylor referred him to Henry Radio. A notation appears in defendant's daily reminder for September 24, with the name "Henry Radio." A sales clerk at the store identified Robert Homick in a photo lineup as the man to whom he had sold a walkie-talkie battery. The sales receipt recording the sale had Robert Homick's address on it. Defendant returned to Las Vegas on the evening of September 24. Dominguez stayed overnight in Los Angeles at the Westwood Inn, where Robert Homick, using the alias "Robert Gilroy," paid for Dominguez's room.

### 5. *The murders of Vera and Gerald on September 25, 1985, and the aftermath*

About 10:00 a.m. on September 25, defendant appeared at Art Taylor's shop with the walkie-talkies. He wanted different walkie-talkies that would work in Los Angeles. Taylor said he did not know anyone who had such items, whereupon defendant decided to keep the walkie-talkies he had. He asked Taylor to call Robert Homick and tell him to pick defendant up at the airport at 1:00 p.m. Defendant flew to Los Angeles on the same 11:50 a.m. flight he had flown the previous day; he was identified by another passenger. He was met at the Burbank airport by Robert Homick and Dominguez about 1:00 p.m.

Sometime around 2:15 p.m., Gerald and Vera arrived at Jackson's residence to break the Yom Kippur fast. The meal was planned for around 6:00 or 6:30 p.m.

According to Dominguez, he, defendant, and Robert Homick went back and forth between the gates outside the Jackson residence and Vera and Gerald's residence, testing the range of the walkie-talkies. Defendant drove to an alley behind Vera and Gerald's Gorham Avenue apartment building and told Dominguez to go ring their doorbell to see whether anyone was home. No one answered when he pushed the buzzer. Dominguez went back to the car, reported

11

to defendant, and waited while defendant went to check for himself.  Defendant returned after a few minutes and said, "the people were not home."

According to Dominguez, he and defendant drove to Gorham Avenue to meet Robert Homick.  Anthony Majoy was with Robert, wearing "like a black hood sweatshirt."  In his car, defendant was carrying walkie-talkies, a handgun, a shotgun, boltcutters, and his and Dominguez's luggage.  Defendant gave Dominguez a walkie-talkie and dropped him off at a nearby intersection.  Defendant told him to look for an elderly couple in a tan, two-door Mercedes and to let defendant know as soon as he saw them.  Gerald and Vera left Jackson's house sometime between 10:00 and 10:15 p.m. in their tan, two-door Mercedes.  Dominguez radioed defendant when he saw the victims' car.

On the night of September 25, Rodger Backman was visiting his mother, who lived on the third floor of 11959 Gorham Avenue, the apartment building adjacent to 11939 Gorham Avenue, where Gerald and Vera lived.  Backman heard five gunshots and ran out to the balcony.  A retaining wall separated the two buildings, and there was ivy along the wall on the 11939 Gorham side.  Backman heard rustling in the ivy and then saw a man jump over the wall from 11939 Gorham and land on the walkway below him.  Backman shouted, "Hey, I see you," and the man looked up at him.  The man was wearing "some type of martial arts . . . uniform" that was completely black.  It included a hood that covered his entire face except "approximately half an inch above the eyebrows down to a line about even with the bottom of his nose."  The man appeared to be about five and a half feet tall, weighing about 160 pounds, with olive-toned skin.  He did not appear to have anything in his hands.  The man ran toward the back of the building into the alley.  Backman went in pursuit but did not see the man again.

Just as he observed the man jump over the wall between the two apartment buildings, Backman heard more rustling in the ivy on the 11939 Gorham side of

12

the wall, but he was unable to see who was making the noise. That person was running in the opposite direction of the first man. Backman testified that the man who jumped the wall "would not have been" the person making these other noises in the ivy because those noises were in "the opposite direction . . . and this particular sound I heard was running towards the street in the opposite direction south into Gorham." Backman was "absolutely sure . . . that [he] heard two different individuals down in these ivy plants," the man who jumped the wall and landed on the sidewalk beneath Backman, and a second person running in the opposite direction on the other side of the wall.

Backman went downstairs and got up on the wall separating the two apartment buildings. One of the gates into the subterranean garage at 11939 Gorham Avenue was open. He entered the garage and found Gerald slumped over in the driver's seat of his car with a gunshot wound. Backman noticed some neighbors had come out, and he yelled for a doctor and for someone to call the police.

Sometime after 10:05 p.m., Robert Kelly, who lived at 11959 Gorham Avenue with his roommate, Jeff Carolan, heard five gunshots and a woman screaming. The gunshots were coming from outside and were nearby. A few seconds later, someone yelled, "Call the police," and then "Call an ambulance." Kelly, who was an emergency medical technician, picked up his stethoscope and a pen light, and he and Carolan went downstairs. They met up with Backman, who directed them to the garage. They gained entry through a window that Kelly knew was always closed because he passed it every day.

Kelly found Gerald and Vera inside their Mercedes. Gerald was sitting up in the driver's seat, bleeding from his neck and chest. Vera was partly out of the car and appeared to have been shot in the upper torso. After examining them,

13

Kelly decided Vera was in worse condition. He got her out of the car, opened her airways, raised her feet, and then went back to help Gerald, who was still alive.

Los Angeles Police Officers Horan and Kane arrived about 10:30 p.m. They ordered Kelly, Backman, and Carolan out of the garage, made a "sweep," and secured the crime scene. Horan observed that a bicycle chain that secured security bars on the west side of the garage had been cut. Paramedics arrived and pronounced Vera dead at the scene. Gerald was still alive. He was transported to the UCLA Medical Center, where he was pronounced dead. Gerald had been shot below the skull with an exit wound at the bottom of his chin. There was a second grazing wound across his chest. Powder burn marks were indicative of a close-range gunshot. Vera had been shot three times on the left side of her body.

Detectives Richard Crotsley and Jack Holder arrived at the scene about 3:00 a.m. Crotsley observed that Vera was wearing various items of jewelry, that her unopened purse was inside the Mercedes, and that near her foot was a check for $2,000 made out to Gerald from his daughter Maxine. Crotsley concluded that robbery was not the motive for the attack on the victims. While inspecting the security features of the garage, Crotsley noticed that a chain securing gates on the east side of the garage had been cut, leaving the gates open. A chain link and green plastic tubing were discovered outside a gate on the west side of the garage; that gate was also open.

On the morning of September 26, 1985, defendant and Dominguez returned defendant's rental car. Defendant flew back to Las Vegas on PSA flight 446; he was identified by a fellow passenger who also saw a man fitting Dominguez's description, but was unable to positively identify him.

That same day, Neil told Stewart their parents had been murdered. He told Stewart "to stay strong [because] . . . [they] were going to be investigated." The Monday or Tuesday after Yom Kippur, Stewart came into Neil's office while Neil

14

was talking by telephone to Lew Jackson, Muriel Jackson's husband. After he finished the call, Neil told Stewart, "That's going to be our problem. He says he's absolutely convinced that we were involved." Shortly after that conversation, Stewart delivered $15,000 to Robert Homick at the same grocery store where he had previously delivered expense money. On January 9, 1986, Neil wired $28,000 into Robert Homick's bank account, which Neil told Stewart was the balance due for the murder of their parents. The following day, Robert Homick wired $25,000 into Anthony Majoy's bank account. Dominguez was paid $5,000 for his part in the murders.

On September 30, 1985, a claim was made on Vera's life insurance policy. The insurance company ultimately paid the claim in the amount of $506,855.94. Stewart endorsed the check.

The police determined that the bullets used to kill Gerald and Vera were from a .38 Special or .357 Magnum handgun, but the murder weapon was never recovered. In January 1986, police surveillance put defendant, Robert Homick, and Anthony Majoy together in Hollywood. On March 11, 1986, search warrants were executed in Las Vegas and Los Angeles, and defendant, Robert Homick, Neil Woodman, Stewart Woodman, and Anthony Majoy were arrested. Dominguez had been arrested March 2 in Las Vegas on a parole violation. A boltcutter seized from Robert Homick's apartment was determined to be the tool that had cut the chain found outside the garage where Gerald and Vera were murdered. After he was arrested, Neil called Steven Strawn at Manchester Products and asked him to destroy some papers located beneath Neil's desk; among them were defendant's business cards.

15

**B. The Defense Case**

Defendant attempted to establish an alibi, presenting witnesses who testified he had a court appearance in Las Vegas in connection with his divorce on the morning of September 25 before flying to Los Angeles for a doctor's appointment. Two other witnesses who worked at a Los Angeles clinic where defendant had been a patient testified he had shown up at the clinic sometime around lunchtime on September 25 without an appointment, but his doctor was not there.

Joey Gambino testified he had never referred defendant to Stewart for the purpose of eliminating Stewart's parents or had anything to do with the murders. Other witnesses sought to impeach the credibility of Michael Dominguez and Art Taylor.

**C. Robert Homick's Evidence [10]**

Robert Homick called two witnesses to testify about his relationship with defendant. Helen Copitka is the sister of defendant and Robert Homick. Defendant is the eldest child, having been born in 1940; Copitka, the second eldest. There were four other children. Defendant was Robert's main caretaker. He was outgoing, while Robert was shy and withdrawn. Copitka viewed defendant as a leader and Robert as a follower.

The second witness, and her husband, had been close friends of defendant and his wife in the 1960's when they all lived in Los Angeles. She met Robert Homick around 1967 or 1968 when he moved in with defendant. It was not unusual for her to see defendant tell Robert Homick what to do and how to do it.

---

**10**     Neil Woodman called a single witness, his and Stewart's rabbi, whose testimony was aimed at impeaching Stewart's credibility.

Clarence Stromwall, a retired Los Angeles Superior Court judge, had served for many years in the Los Angeles Police Department with Max Herman, the attorney from whom Dominguez testified defendant had obtained a gun the day before the murders. Stromwall testified that Herman would never have given a gun to defendant to use in a crime and that Herman was a good judge of character who could not have been easily manipulated.

Joseph Gersky, an FBI agent, testified that in an interview with Michael Dominguez on March 18, 1986, Dominguez told him he did not know who was involved in the Woodman murders, other than defendant. Later, Dominguez told Gersky that defendant's other brother, William Homick, and Anthony Majoy were involved.

## II. PENALTY PHASE

### A. The Prosecution Case

The prosecution's penalty phase case consisted of the circumstances of the current crime and evidence that defendant had committed a triple murder in Las Vegas for which he had been convicted *after* the Woodman murders.[11] On the morning of December 11, 1985, Bobbie Jean Tipton, a wealthy Las Vegas woman, her maid, Marie Bullock, and a deliveryman, James Myers, were shot to death at Tipton's residence. Inside Tipton's bedroom, police found drawers pulled open, jewelry boxes on the bed, and jewelry strewn about. A floor safe in the closet had also been opened.

Defendant had been in charge of security at a small chain of jewelry stores, Tower of Jewels, where Tipton had had her jewelry cleaned several months before

---

[11] Thus, the court admitted the evidence under section 190.3, factor (b) (other involvement in violent criminal activity) rather than factor (c) (prior felony conviction).

17

her murder.  Defendant was convicted of the murders based largely on the testimony of Timothy Catt, who managed one of the branches of Tower of Jewels.  According to Catt, defendant had asked him several times about the value of Tipton's jewelry while Catt was cleaning and repairing it.  Later, after the murders, defendant brought Catt jewelry that had belonged to Tipton and admitted he had killed her and the other two victims.[12]

## B.  The Defense Case

Defendant's witnesses attempted to establish an alibi for his whereabouts at the time of the Tipton murders and to impeach Timothy Catt's credibility.  Additional defense witnesses sought to blame the Tipton murders on Michael Dominguez and another man, Kelly Danielson.

## DISCUSSION

# I.  PRETRIAL AND GUILT PHASE ISSUES

## A.  Section 656

Defendant contends that under section 656, his 1991 conviction in federal court of interstate murder for hire (18 U.S.C. former § 1952A)[13] barred his subsequent California convictions for the Woodman murders.  At the time of defendant's trial, section 656 provided:  "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of another State,

---

[12]  Further evidence regarding the Tipton murders is discussed where relevant to an issue raised by defendant.

[13]  The interstate murder-for-hire statute has since been renumbered from title 18 United States Code section 1952A to section 1958.  Defendant was charged under the former section, to which this opinion will therefore refer.

18

Government, or country, founded upon the act or omission in respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense."[14]

Section 656 provides "greater double jeopardy protection than the United States Supreme Court has determined to be available under the Fifth Amendment of the United States Constitution," as the Constitution does not bar "prosecution and conviction for the same act by both state and federal governments." (*People v. Belcher* (1974) 11 Cal.3d 91, 96-97 (*Belcher*).) We conclude, however, that the statute does not apply under the circumstances of this case. Because the California special circumstance charge of murder by means of lying in wait (§ 190.2, subd. (a)(15)) required proof of conduct that was not necessary for proof of the prior federal murder-for-hire charge, the prior conviction provided no defense under section 656 to the state murder charges.

### 1. *Background*

A federal indictment filed on March 16, 1989, charged defendant, along with Robert Homick, Neil Woodman, Stewart Woodman, and other defendants with various combinations of 11 counts.

Count XI of the federal indictment alleged a violation of the federal murder-for-hire statute in that, "[f]rom or about September 23 through September 25, 1985, in the District of Nevada and elsewhere," defendant and his

---

**14** A later amendment to section 656 (Stats. 2004, ch. 511, § 1, p. 4109) removed from its scope prior proceedings in a foreign country and replaced "founded upon the act or omission" with "based upon the act or omission," giving the statute its present form: "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, or of another state or territory of the United States based upon the act or omission in respect to which he or she is on trial, he or she has been acquitted or convicted, it is a sufficient defense."

codefendants "did travel and cause travel in interstate commerce, that is travel between the State of Nevada and the State of California, by STEVEN MICHAEL HOMICK and Michael Dominguez with the intent that a murder be committed in violation of the Penal Code of California, said murder to be committed in consideration for the receipt of and for a promise and agreement of money; which travel resulted in the deaths of Vera and Gerald Woodman."

The federal jury was instructed, largely in language drawn from the statute,[15] as follows: "Whoever travels in or causes another (including the intended victim) to travel in interstate commerce or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with the intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, if death results . . . [¶] shall be guilty of an offense against the United States." Defendant was convicted on count XI and sentenced to life imprisonment; his conviction was later affirmed in an unpublished decision. (*United States v. Woodman* (9th Cir. 1992) 980 F.2d 740 (table) [1992 WL 357106].)

---

**15** At the time of the offense, title 18 United States Code former section 1952A provided: "Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined not more than $10,000 or imprisoned for not more than five years, or both; and if personal injury results, shall be fined not more than $20,000 or imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both." (Added Pub.L. No. 98-473, tit. II, § 1002(a) (Oct. 12, 1984) 98 Stat. 2136; see now 18 U.S.C. § 1958.)

In the present California case, defendant orally joined Neil Woodman's motion to dismiss based on his federal conviction. The trial court denied the motion.

### 2. *Analysis*

"[P]rosecution and conviction for the same act by both state and federal governments are not barred by the Fifth Amendment guarantee against double jeopardy. (*Abbate* v. *United States* (1959) 359 U.S. 187, 194-195 [3 L.Ed.2d 729, 733-735, 79 S.Ct. 666]; *Bartkus* v. *Illinois* (1959) 359 U.S. 121, 136 [3 L.Ed.2d 684, 694, 79 S.Ct. 676]; *United States* v. *Lanza* (1922) 260 U.S. 377, 382 [67 L.Ed. 314, 317, 43 S.Ct. 141].) This rule, however, does not preclude a state from providing greater double jeopardy protection than is provided by the federal Constitution under decisions of the United States Supreme Court. [Citations.]" (*People v. Comingore* (1977) 20 Cal.3d 142, 145 (*Comingore*).) Like many other states (see fn. 17, *post*), California bars certain such "dual sovereign" prosecutions by statute.

As noted, section 656 provides: "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, or of another state or territory of the United States based upon the act or omission in respect to which he or she is on trial, he or she has been acquitted or convicted, it is a sufficient defense."[16] The section was enacted in 1872 as part of our first Penal Code and has been amended only once, in 2004, as earlier described

---

**16** Defendant also cites section 793, which provides: "When an act charged as a public offense is within the jurisdiction of the United States, or of another state or territory of the United States, as well as of this state, a conviction or acquittal thereof in that other jurisdiction is a bar to the prosecution or indictment in this state."

(see fn. 14, *ante*). A note by the 1872 code commissioners explains that the statute focuses on acts and omissions, and does not require identity of *charges*: "This section is intended to apply in cases where the foreign acquittal or conviction took place in respect to the particular *act or omission* charged against the accused upon the trial in this State, and is not restricted to cases where the accused was tried abroad under the same *charge*." (Code commrs. note foll. Ann. Pen. Code, § 656 (1st ed. 1872, Haymond & Burch, commrs. annotators) p. 241.) In accord with this intent, as well as the statute's plain language, we have held section 656 applies when the *physical conduct* required for the California charges has previously been the subject of an acquittal or conviction in another jurisdiction, regardless of whether the two charges have different requirements as to intent or other nonact elements. (*Comingore*, *supra*, 20 Cal.3d at pp. 146-148; *Belcher*, *supra*, 11 Cal.3d at pp. 99-100.)[17]

---

**17**     Sections 656 and 793 (also enacted in 1872) are drawn from the New York codes associated with David Dudley Field. (See Hagburg, *Statutory Bars to Dual Sovereign Prosecutions: The Minnesota and North Dakota Approaches Compared* (1996) 72 N.D. L.Rev. 583, 592-593 [giving texts of the Field code provisions].) Several other states, mostly in the West, have similar laws comparing the *acts or omissions* required for conviction under the first and second prosecutions. (See, e.g., Idaho Code, § 19-315; Mont. Code Ann., § 46-11-504; Nev. Rev. Stat. Ann., § 171.070; N.D. Cent. Code, § 29-03-13; Okla. Stat. Ann., tit. 22, § 130; Va. Code Ann., § 19.2-294; Wn. Rev. Code, § 10.43.040.)

The Model Penal Code and states following it take a seemingly narrower approach, focusing on proof of different *facts* in the two proceedings and on the *purposes* of the first and second statutes. (Model Pen. Code, § 1.10 [prosecution barred by former conviction or acquittal in another jurisdiction if based on the same conduct, unless "each [offense] requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil . . ."]; see, e.g., Ark. Code Ann., § 5-1-114; Del. Code Ann., tit. 11, § 209; Hawaii Rev. Stat., § 701-112; N.J. Stat. Ann., § 2C:1-11; 18 Pa. Cons. Stat. Ann., § 111.)

*(footnote continued on next page)*

This court has construed and applied sections 656 and 793 in only two cases, *Belcher* and *Comingore*.

In *Belcher*, the defendant and a companion had robbed at gunpoint two undercover officers—one a federal agent, the other a local policeman—who had arranged a narcotics purchase. We held that section 656, coupled with the defendant's prior acquittal in federal court of assault with a deadly weapon on a federal officer, provided a defense to conviction in California court for assault with a deadly weapon based on the same conduct, but not to two counts of robbery arising out of the same incident. (*Belcher*, *supra*, 11 Cal.3d at pp. 99-101.)

Construing section 656 for the first time in *Belcher*, we distinguished its prohibition on multiple prosecutions from that in section 654, which, in addition to prohibiting multiple *punishment* when an act or omission is punishable under multiple California penal provisions, further provides that "[a]n acquittal or conviction and sentence under any one [provision] bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) Despite the statutes' similar language, we determined section 656 did not apply as broadly as section 654. (*Belcher*, *supra*, 11 Cal.3d at pp. 97-98.) In *Kellett v. Superior Court* (1966) 63 Cal.2d 822, 827, we had construed section 654's multiple prosecutions bar to apply whenever "the same act or course of conduct plays a significant part" in two or more offenses, assuming the prosecution in the first case was or should have been aware of all the offenses. In *Belcher*, we observed that the *Kellett* rule

---

*(footnote continued from previous page)*

Other states, more strictly still, require the two prosecution to be for the same *offense*, or for two offenses substantially identical in all their *elements*. (See, e.g., Minn. Stat. Ann., § 609.045; N.Y. Crim. Proc. Law, § 40.20, subd. 2(a), (b); Utah Code Ann., § 76-1-404.)

assumes "the state has the opportunity to charge all offenses that may arise out of a single course of criminal conduct," an assumption that "cannot be made where, as here, one of the prosecutions occurred in another jurisdiction." (*Belcher*, at p. 98.) Section 656 thus demands a narrower construction than section 654.

Turning to the critical question of when a prior conviction or acquittal in another jurisdiction is considered to have been "founded upon the act or omission" for which the defendant is being tried in California, within the meaning of former section 656 (see fn. 14, *ante*), we reviewed in *Belcher* a pair of appellate decisions dealing with a single defendant, *People v. Candelaria* (1956) 139 Cal.App.2d 432 (*Candelaria I*) and *People v. Candelaria* (1957) 153 Cal.App.2d 879 (*Candelaria II*). As we explained, in *Candelaria I* the "defendant asserted that under section 656 his prior conviction in federal court of robbery of a national bank was a bar to his subsequent state conviction for robbery of the same bank. The Court of Appeal agreed. 'The physical act or conduct of defendant in taking the money was the same whether the robbery be considered as a federal offense or a state offense. All the acts constituting the state offense were included in the federal offense and were necessary to constitute the federal offense. It is clear that, within the meaning of said section 656, the federal conviction was "founded upon the act" in respect to which the defendant was tried in the present case. It appears, as a matter of law, that the previous federal conviction is a sufficient defense in the present case.' " (*Belcher*, *supra*, 11 Cal.3d at pp. 98-99, quoting *Candelaria I*, at p. 440.)

In *Candelaria II*, the same defendant again cited section 656 to challenge a California conviction, in this case for *burglary* arising out of the same transaction as the prior federal robbery charges. This time, we noted in *Belcher*, the Court of Appeal rejected his argument because the act required for burglary, " 'the entering of the building with the intent to commit a theft, is not the same act complained of

24

in the federal court, namely, that he pointed a gun at the teller and by force and fear compelled her to deliver over to him certain monies.' " (*Belcher*, *supra*, 11 Cal.3d at p. 99, quoting *Candelaria II*, *supra*, 153 Cal.App.2d at p. 884.)

Approving the *Candelaria* decisions, *Belcher* drew from them the following test for application of section 656: "Under this section, a defendant may not be convicted after a prior acquittal or conviction in another jurisdiction if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution [citation]; however, a conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution. [Citation.]" (*Belcher*, *supra*, 11 Cal.3d at p. 99.)

Applying that rule to the facts of *Belcher*, we held that the defendant, having been acquitted in federal court of assault upon a federal officer, could not be convicted in state court "for the same assault upon the same person." (*Belcher*, *supra*, 11 Cal.3d at p. 99.) As to the two state robbery convictions, however, the rule led to the opposite result. "A conviction for each of these offenses requires at the very least proof of an important additional act by defendant—the 'taking of personal property in the possession of another' (§ 211)—that need not be proved to establish the federal offense of assault with a deadly weapon upon a federal officer. Accordingly, the convictions of first degree robbery under the first two counts are not convictions founded upon the same act or omission for which defendant was acquitted in federal court, and these convictions must stand." (*Belcher*, at pp. 100-101.)

In *Comingore*, *supra*, 20 Cal.3d 142, we held section 793, which defendant also cites, barred the defendant's prosecution in California for grand theft auto and unlawful driving of a vehicle, where he had previously been convicted of an offense in Oregon arising out of the same act (taking a car in California without permission and driving it to Oregon). (*Comingore*, at p. 144.) We determined that

section 793's protective scope was the same as that of section 656, though the former provision acted to bar prosecution and the latter as a defense against conviction. (*Comingore*, at p. 148.) Quoting and applying the *Belcher* test for application of section 656, we held that although the charged California offenses required the intent to deprive the owner temporarily or permanently of possession of her vehicle, an element assertedly not required for the Oregon conviction, section 656 (and hence § 793) applied because the intent required for an offense is distinct from the act on which the offense is based. The People having conceded the Oregon conviction was based on "the same *physical conduct*" giving rise to the California prosecution (*Comingore*, at p. 146), the latter prosecution was barred even though it called for proof of an additional intent element (*id.* at pp. 146-149).

The Courts of Appeal have addressed section 656 in several published decisions since *Comingore* but, with the exception of *People v. Friedman* (2003) 111 Cal.App.4th 824, discussed below, none involved facts similar to the present case.[18] We look, therefore, to the language and purposes of the statute, as well as

_____

**18**     See *People v. Bellacosa* (2007) 147 Cal.App.4th 868, 877 (Nevada conviction for driving under the influence and evading a peace officer did not bar California prosecutions for corresponding offenses, where charges in each state rested solely on driving within that state); *People v. Gofman* (2002) 97 Cal.App.4th 965, 973-976 (federal convictions for conspiracy and mail fraud barred state prosecution for conspiracy, insurance fraud, and grand theft based on same staged automobile accident scheme); *People v. Lazarevich* (2001) 95 Cal.App.4th 416, 424-426 (conviction in Republic of Serbia for kidnapping a child did not bar later conviction in California for concealing the same child, where convictions were based on conduct during distinct time periods); *People v. Brown* (1988) 204 Cal.App.3d 1444, 1450-1451 (conviction in federal court for conspiring to transport stolen goods in interstate commerce, based on a Nevada-formed scheme to burglarize a California jewelry store, did not bar later prosecution in California for burglary of the same store); *People v. Walker* (1981) 123 Cal.App.3d 981, 986-987 (Nevada conviction for possession of stolen

*(footnote continued on next page)*

26

our prior decisions, to decide whether section 656 applies in the circumstances of this case.

According to its terms, section 656 provides a defense to a California prosecution only if the prior foreign prosecution was based upon "the act or omission" for which the defendant is "on trial" in California. In accord with that language, we held in *Belcher* that a California conviction *is barred* if all the acts necessary to the California charges were also necessary to prove the prior charges, but is *not barred* "where the offense committed is not the same act but involves an element not present in the prior prosecution." (*Belcher*, *supra*, 11 Cal.3d at p. 99.) In *Comingore*, we clarified that "element" in this formulation refers only to *conduct* required to prove the charges, not to criminal intent or other nonact elements. (*Comingore*, *supra*, 20 Cal.3d at pp. 146-148.)

The application of section 656 thus turns on whether the California charges against defendant required proof of conduct that was not required for conviction of the earlier federal charges. We conclude that at least in the special circumstance allegation of murder by lying in wait, they did.

The lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) requires proof the killer concealed his or her purpose, watched and waited a substantial time for the opportunity to act, and thereafter launched a surprise attack on the victim from a position of advantage. (*People v. Bonilla* (2007) 41 Cal.4th 313, 330.) No such conduct was required under title 18 United States Code former

*(footnote continued from previous page)*

traveler's checks did not bar California prosecution for robbery in which the checks were taken).

27

section 1952A, which was satisfied by proof defendant traveled between states in order to commit a murder for hire, and death resulted.[19]

Nor did the federal *indictment* against defendant charge any of the conduct constituting lying in wait. The indictment alleged only that defendant and Dominguez traveled between Nevada and California with the intent that a murder be committed in exchange for compensation, and that the travel resulted in the Woodmans' deaths. That the federal prosecutor, like the state prosecutor

---

[19] At oral argument, the Attorney General maintained that, lying in wait aside, the Woodmans' killing itself was conduct not required to prove the earlier federal charge of interstate travel for the purpose of murder for hire (18 U.S.C. former § 1952A), which required proof that "death result[ed]" from defendant's interstate travel only in order to obtain the greatest punishment allowed under the statute, then life imprisonment. In somewhat similar circumstances, comparing a California murder prosecution with a prior federal prosecution for interstate travel in aid of racketeering (18 U.S.C. § 1952, known as the Travel Act), the court in *People v. Friedman*, *supra*, 111 Cal.App.4th at page 836, asserted, "There was no requirement in the federal prosecution that the defendants commit a murder." (But see *United States v. Friedman* (2d Cir. 2002) 300 F.3d 111, 127-128 [death of a victim resulting from a crime of violence (the target offense of interstate travel) is an element of a Travel Act offense when a life sentence is sought, though the defendant need not have personally participated in murder]; see also *Jones v. United States* (1999) 526 U.S. 227, 252 [federal carjacking statute establishes a set of separate offenses with differing punishments, the most severe requiring proof that death resulted from the carjacking].) Because we determine the lying-in-wait special-circumstance allegation prevented the application of section 656 here, we need not decide whether killing the Woodmans was conduct required for defendant's conviction and life sentence under title 18 United States Code former section 1952A.

As an alternative rationale, the court in *People v. Friedman*, *supra*, 111 Cal.App.4th at page 837, relied on *People v. Brown*, *supra*, 204 Cal.App.3d 1444, for the theory that the *federal* offense's inclusion of a requirement not present in the *state* charges (interstate travel, in *Friedman*) precluded the application of section 656. The Attorney General makes the same argument here as to title 18 United States Code former section 1952A. Again, we need not decide whether the interpretation given section 656 in *Brown* is correct, as the special circumstance allegation made section 656 inapplicable in any event.

afterward, proved defendant ambushed and killed the Woodmans in their garage (see *United States v. Woodman*, *supra*, 1992 WL 357106, *1) is of no import, as proof of an ambush was not "*necessary* to prove the offense in the prior prosecution" (*Belcher*, *supra*, 11 Cal.3d at p. 99, italics added).  A prior prosecution is not "founded" or "based," within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial.  Were that the rule, the entire course of criminal conduct that led to the earlier charges would be effectively protected from prosecution in California, an interpretation we expressly rejected for section 656 (in contrast to § 654) in *Belcher*, *supra*, 11 Cal.3d at page 98.  (See also *id.* at p. 101, fn. 10 [noting that Belcher's California robbery convictions, which we held were not barred under § 656 by his prior federal conviction for assault on a federal officer, would likely have been barred under a § 654 course-of-conduct analysis had the two prosecutions been brought sequentially in California courts].)

That the allegation of murder by means of lying in wait was contained in a special circumstance allegation attached to the murder charge, rather than in a separate count charging an offense, does not mandate the application of section 656.  Although *Belcher* refers to "the acts constituting the *offense* in this state" (*Belcher*, *supra*, 11 Cal.3d at p. 99, italics added), we did not have before us in *Belcher* the issue of conduct charged in a special circumstance or similar allegation.  The language of section 656 itself is not restricted to offenses.  Instead, it refers to "the act or omission in respect to which [the defendant] *is on trial*" (italics added), implying the potentially relevant charges against the defendant are not limited to those specifying offenses.  Defendant here was indisputably "on trial" for murder by means of lying in wait; indeed, lying in wait was at issue both

29

as a theory of first degree murder (§ 189)[20] and as a special circumstance making defendant eligible for a sentence of death or life without the possibility of parole (§ 190.2, subd. (a)(15)).

Moreover, factual sentencing allegations that make the defendant eligible for a death sentence have, for constitutional purposes including double jeopardy, been viewed as functionally equivalent to elements of a greater offense. (See *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101, 111-112; *Ring v. Arizona* (2002) 536 U.S. 584, 609.) The allegations against defendant of first degree murder with a special circumstance of murder by lying in wait can be conceptualized, for double jeopardy purposes, as a greater offense (inclusive of first degree murder) of first degree murder by means of lying in wait, with lying in wait as one necessary element making up that offense. And while section 656 provides double jeopardy protection in the dual-sovereign situation to which the constitutional protection does not extend (*Belcher*, *supra*, 11 Cal.3d at p. 97), the constitutional and statutory protections serve the same general purposes. No reason appears for the treatment of special circumstance allegations to differ under the two regimes.

Double jeopardy protection vindicates principles of fairness and finality by preventing the government from making repeated efforts to convict the defendant or adding to his or her punishment for the same offense. (*United States v. Wilson* (1975) 420 U.S. 332, 343.) But where two different sovereign governments are involved, the interest of each in punishing criminal conduct as it finds fitting also comes into play. Constitutionally, this consideration motivates the dual sovereignty doctrine, under which double jeopardy protection is withdrawn

---

[20] The jury was instructed on both lying in wait and premeditation as theories of first degree murder.

entirely from the second prosecution.  (See *Abbate v. United States*, *supra*, 359 U.S. at p. 195; *Bartkus v. Illinois*, *supra*, 359 U.S. at p. 137.)  Section 656 restores some of that protection, but applies only when the conduct charged in California has already been the subject of a completed federal or sister-state prosecution; in other situations, the statute does not prevent the state from pursuing its interest in punishing criminal conduct.

Where California charges the defendant with conduct that makes him or her eligible for the state's most severe punishments, death and life in prison without the possibility of parole, and that particular conduct has not been the subject of a prior federal or sister-state prosecution, the state's interest in a separate prosecution is particularly strong, while the protective purposes of section 656 are not implicated.  California's prosecution of defendant for murder *by means of lying in wait* was not unfair to him, as he had not previously been prosecuted for that conduct, nor did it impugn the finality of a prior judgment, as the federal court verdict did not adjudicate the lying-in-wait issue.  The state, moreover, has a substantial interest in enforcing its laws differentiating between noncapital murders and murders that are so heinous as to merit either of our law's greatest punishments, an interest the prior federal prosecution could not and did not serve.  Neither the federal Constitution nor section 656 restricts California, as a sovereign government separate from that of the United States, from pursuing its own interest in punishing murder where the acts comprising the special circumstance have not previously been the subject of a federal prosecution.

In the heading of his section 656 claim, but without making any argument on the point, defendant also contends his federal conviction for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) statutes, title 18 United States Code section 1961 et seq., barred the murder convictions under section 656.  In the interest of completeness, we note that the reasoning used

31

above would also apply to defendant's RICO conviction. Although the federal RICO count charged the Woodmans' murders as two of five alleged crimes establishing a pattern of racketeering activity (see 18 U.S.C. § 1961(5)), neither RICO itself nor the indictment's RICO count required proof those murders were committed by means of lying in wait. Under section 656, therefore, the prior RICO conviction provided no defense to the California charges of murder by means of lying in wait.

## B. Severance

Defendant contends that the trial court abused its discretion when it denied his various severance motions.

### 1. *Background*

The five defendants tried for the Woodman murders were divided into two groups for trial. Stewart Woodman and Anthony Majoy were tried first, and then defendant, Neil Woodman, and Robert Homick were tried together in the proceeding before us. Defendant filed a pretrial motion to sever his trial from that of his brother Robert Homick and Neil Woodman. Neil Woodman also sought to sever the cases.

In the trial court, defendant contended that severance was required because the earlier severance of Stewart's trial from Neil's trial because they are brothers was "law of the case," also prohibiting the joint trial of himself and his brother; a joint penalty phase trial would deny each Homick individual consideration; there was a danger of inconsistent defenses; and the prosecution intended to introduce a jailhouse letter from Neil to Stewart implicating defendant. Additionally, he argued that, at a joint penalty phase trial, he would suffer in comparison to his brother because most of the penalty phase evidence would be introduced only against defendant. In a supplemental memorandum of points and authorities,

32

defendant argued that any *Aranda/Bruton* issues should be resolved at the hearing on the severance motion because they were relevant to whether the cases should be severed. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123 [a nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible].)

At the hearing, the trial court indicated it would impanel two juries, one to hear defendant's case and the other to hear the case against Neil Woodman and Robert Homick. Its decision was based on its concern about the fairness of having one jury decide the penalty for both Homicks. At that point, the prosecutor informed the court that he would not seek the death penalty against Robert Homick, thus "eliminat[ing] the need for two juries." Nonetheless, both defendant and Neil Woodman pressed for severance. The trial court denied the motion.

During the trial, defendant renewed his motion for severance following the opening statement by Robert Homick's counsel, on the "grounds of conflicting defenses"; after the trial court ruled that Robert Homick's counsel could question Art Taylor about his status as an FBI informant; after the trial court ruled that the prosecution could ask FBI Agent Joseph Gersky whether he believed Michael Dominguez was being truthful after a second interrogation where Dominguez contradicted statements he had made in an earlier interrogation; and after the trial court excluded evidence defendant wanted to present that Robert Homick had threatened violence against a former employee of Stewart and Neil's.[21]

---

[21] In his opening brief, defendant lists 16 evidentiary rulings that he asserts demonstrate severance was warranted. As the Attorney General points out, however, defendant did not renew his severance motions on 12 of these occasions. Thus, to the extent he now claims that severance was warranted by these rulings, he has forfeited the claims. (*People v. Tafoya* (2007) 42 Cal.4th 147, 163 ["[D]efendant has forfeited this issue on appeal because he failed to assert this

*(footnote continued on next page)*

33

Finally, defendant argued as a ground in his motion for a new trial the court's denial of his pretrial severance motion.  The motion was denied.

## 2. *Analysis*

"Our Legislature has expressed a preference for joint trials.  [Citation.] Section 1098 provides in pertinent part:  'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.'  The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses.  [Citations.]  Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'  [Citations.]  [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion.  [Citation.]  If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial.  [Citations.]  If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 452.)  Severance motions in

_____

*(footnote continued from previous page)*

ground at the time his severance motion was heard by the trial court."]; *People v. Ervin* (2000) 22 Cal.4th 48, 68 ["If further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever."].) Defendant's assertion that further motions were futile is belied by the fact that he did make further motions.

capital cases generally receive heightened scrutiny for potential prejudice. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43-44.)

Defendant and his codefendants were "charged with having committed 'common crimes involving common events and victims,' " presenting a " ' "classic case" ' for a joint trial." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Nonetheless, defendant contends that severance was required.

Defendant fails to adequately distinguish between his pretrial, trial, and posttrial motions and his due process analysis. As distinct standards of review apply to his various severance motions, however, we must parse his claim into its distinct components.

Two of the grounds in defendant's pretrial severance motion related to a possible joint penalty-phase trial with his brother, Robert Homick, but once the prosecution decided not to seek the death penalty against Robert, those arguments were mooted. Defendant does not renew a third ground he advanced in his pretrial motion—that an earlier ruling severing the trials of Stewart Woodman and Neil Woodman was "law of the case" for purposes of the Homick brothers—and we do not consider it. A fourth ground involving defendant's claim that the prosecution intended to introduce a jailhouse letter from Neil to Stewart implicating defendant is moot because the letter was not introduced at trial.

Therefore, the only ground supporting defendant's pretrial motion still viable is his claim of conflicting defenses. The premise of this claim was that his codefendants, and particularly Robert Homick, would seek to introduce evidence in support of their defenses that was prejudicial to him and would have been inadmissible if he were tried separately. His pretrial motion did not point to any specific evidence except the letter from Neil to Stewart, which was not ultimately introduced. As to Robert Homick, he asserted only that Robert's counsel "will be obligated to bring forth any evidence from prosecution witnesses that [defendant]

35

planned and carried out the murder on his own. He will support this in part by evidence which, if presented by the prosecution would constitute <u>Aranda-Bruton</u> error."

In response, the prosecutor argued that, while he would seek admission of statements that either came within the hearsay exception for coconspirator statements or were not hearsay, he did so with the understanding that if "it's an Aranda violation, then it will not be admissible . . . ." Defendant insisted that the "Aranda-Bruton issues" be litigated before and not during trial. The trial court, while expressing its preference for pretrial resolution of those issues, also remarked "we don't have to resolve that today . . . ." The trial court failed to explicitly rule on defendant's motion, and defendant did not press for a ruling or make any further argument.

Evidently, the trial court did not consider the possible introduction of the defendants' extrajudicial statements implicating each other in the offenses a sufficient ground for granting defendant's pretrial severance motion. Rather, the trial court believed those issues could be litigated as they arose. The defense did not demonstrate otherwise during the hearing. On this record, we conclude the trial court did not abuse its discretion when it denied the pretrial motion.

Defendant renewed his motion for severance on four occasions during the trial. We review each ruling for abuse of discretion "on the facts as they appeared at the time of the ruling." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.)

Following the opening statement by Robert Homick's attorney, defendant renewed his motion on the grounds of "conflicting defenses," but made no further comment or argument. The trial court responded: " I did listen to all 37 statements [*sic*], and I heard nothing in them that is different than the court was aware of before, and the motion is denied." Defendant now contends the

36

"unmistakable implication" of the opening statement was "that [defendant] was guilty of conspiring with the Woodman brothers to murder their parents, and anything Robert did that furthered the plot was done without knowledge of the goal of the conspirators." He cites specific remarks in the opening statement, including counsel's statement that the jury should be careful to consider the Homick brothers separately; that only defendant, and not Robert Homick, was hired to provide security at the bar mitzvah of Neil Woodman's son and to bug the office at Manchester Products; that statements by Stewart and Neil about their "people in Las Vegas" applied only to defendant; and when Stewart and Neil wanted their parents killed they turned to defendant, not Robert Homick.

Severance is not required simply because one defendant in a joint trial points the finger of blame at another. " ' "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) The opening statement by Robert Homick's attorney pointed out the difference between Robert's and defendant's ties to Stewart and Neil but did not, in and of itself, rise to the level of antagonistic defenses requiring separate trials. Moreover, as shown below, there was more than "sufficient independent evidence" (*ibid.*) against defendant to make clear any conflict alone did not demonstrate his guilt.

Defendant next renewed his severance motion after the trial court ruled that Robert Homick's attorney could question Art Taylor about the reason Taylor became an FBI informant: Taylor believed defendant was using him to help

37

distribute drugs. Acknowledging the possible prejudice to defendant, the court instructed the jury that it "may not consider the testimony about [defendant's] involvement in drugs, if they believe it, as character evidence or as evidence indicating that he was a person likely to commit a crime." Presuming, as we must, that the jury followed the instruction, we conclude the trial court did not abuse its discretion when it denied defendant's severance motion. (See *People v. Avila* (2006) 38 Cal.4th 491, 575 ["[A]ssuming [codefendant's] extrajudicial statement about defendant incriminated defendant, it did not prejudice defendant because the court admonished the jury not to consider it for any purpose against defendant, and we presume the jury followed the instruction."].)

Defendant next renewed his motion to sever during the testimony of FBI Agent Joseph Gersky. Gersky was called by Robert Homick to testify that when Gersky initially interviewed Michael Dominguez, Dominguez told him he did not know who else had participated in the Woodman murders other than defendant. Gersky disbelieved him. During a second interview, Dominguez told Gersky that two other men had assisted defendant: Anthony Majoy and defendant's brother, William Homick, also known as "Moke." On cross-examination, the prosecutor elicited testimony from Gersky that what Dominguez had actually told him during the second interview was that Majoy and "Steve's brother" had participated in the murders, without specifying whether it was William or Robert. The prosecutor, over defendant's objection, was also permitted to ask Gersky whether he believed Dominguez during the second interview; Gersky said he did.

Defendant objected that the latter question allowed Gersky to vouch for Dominguez's credibility not only on the specific subject of which brother assisted defendant, but as to all of Dominguez's statements about defendant's participation in the murders. Therefore, he "move[d] to sever." Ultimately, the trial court

38

restricted the prosecution to asking only whether Gersky believed Dominguez with respect to his "Steve's brother" statement.

On this record, we fail to see an abuse of discretion. The issue here was not so much a conflict in defenses between the Homick brothers as it was an evidentiary question about the extent to which the prosecution could elicit from a defense witness testimony damaging to defendant. It was a minor dispute in a lengthy trial that the trial court reasonably resolved by limiting the scope of the prosecutor's questioning of Gersky.

Finally, defendant renewed his motion to sever after the trial court excluded evidence he wished to present that Robert Homick had, on Stewart Woodman's behalf, threatened violence against a former employee of Stewart and Neil's, Robert Richardson, who lived in Missouri. Defendant attempted to introduce this evidence to rebut evidence that Robert Homick was subservient to his brother and operated only at his direction. Defense counsel explained the Missouri evidence would show "Robert had a mind of his own and would do things at the direction of somebody else . . . specifically . . . Stewart Woodman." When the trial court excluded the evidence, defendant renewed his motion to sever. Defense counsel argued that defendant was being denied the ability to present evidence that would have been admissible at a separate trial. The trial court denied the motion.

Defendant contends the denial of his severance motion constituted a denial of his right to present a complete defense under the Sixth Amendment to the United States Constitution.[22] We find no abuse of the trial court's discretion. As

---

[22] Below, we discuss in detail his claim that exclusion of this evidence was error. The reasons we give for rejecting that claim—because, for example, the proposed evidence was cumulative and would have lead to a minitrial on a collateral issue—might well have applied even at a separate trial. (See pt. I.E.,

*(footnote continued on next page)*

39

the trial court noted, there was other evidence that Robert Homick had engaged in unlawful activities at the sole behest of Stewart Woodman, including committing insurance fraud and threatening Jack Swartz, one of Manchester Products's debtors. (See pt. I.F.1., *post*.)

Defendant contends that, whether or not the trial court abused its discretion in ruling on his motions at the time they were made, denial of severance resulted in gross unfairness sufficient to constitute a denial of due process. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.)

Defendant claims he was prejudiced by statements admitted against his codefendants that would have been inadmissible against him in a separate trial; he was prejudicially associated with his codefendants; there was a danger the jurors were confused because of the amount of evidence admitted against his codefendant, Neil Woodman, that would not have been admitted in a separate trial; there were conflicting defenses; the existence of "complex evidentiary issues" engendered by the joint trial consumed scarce judicial resources; and he was denied specific trial rights, including his Sixth Amendment rights to present a defense and to confront the witnesses against him. (*People v. Boyde* (1988) 46 Cal.3d 212, 232 [grounds justifying severance include (1) extrajudicial statement by a codefendant; (2) prejudicial association; (3) likely confusion from evidence on multiple counts; (4) conflicting defenses; (5) possibility of exonerating testimony from a codefendant in a separate trial].)

Defendant lists nine extrajudicial statements made by codefendants and admitted by the trial court which he claims prejudiced him and amount to a

---

*(footnote continued from previous page)*

*post*.) The trial court acknowledged as much in comments it made after denying the motion to sever.

showing of gross unfairness. Three of the nine statements made no mention of defendant at all but were admitted against Robert Homick or Neil Woodman. Furthermore, the trial court gave a limiting instruction with respect to two of these statements, specifically admonishing the jury the statements could not be considered against defendant. We presume the jury understood and followed this instruction. (*People v. Avila*, *supra*, 38 Cal.4th at p. 575.)

Four of the statements were made by either Stewart or Neil about their relationship with defendant: that he did collection work for them; that he was their "man in Las Vegas" and "tougher" than the Mafia; that he could get anything of an illegal nature done; and that he was a "heavy guy." The first statement was admitted under the coconspirator exception to the rule against hearsay (Evid. Code, § 1223) against *defendant* as well as Neil Woodman, while the second statement came in against all defendants as evidence of a conspiracy to murder Gerald and Vera. As such, their admission would have been sought against defendant in a separate trial where he would have faced the same conspiracy charges.[23]

The third statement came up in cross-examination as an example of how Stewart mocked Neil's relationship with defendant. The fourth statement, as we explain below (see pt. I.F.6., *post*), was clearly not intended to be a characterization of defendant, but a comment on Neil's desire to be associated with a "tough guy." In any event, it does not amount to gross unfairness constituting a due process violation.

---

[23]    Our conclusion is not dependent upon whether the statements were or were not properly admitted—a question we take up below (see pt. I.F., *post*.) We are here concerned simply with whether admission of the statements, whether justifiably or in error, resulted in a due process violation.

Defendant also complains about the admission of another statement—Robert Homick's statement that it was coincidental that he happened to be outside on the Woodmans' street on their anniversary. Defendant asserts it undercut his defense, which was to point the finger of blame at his brother, because otherwise the evidence would have suggested Robert Homick was stalking the Woodmans on that date. Any such effect was, at most, marginal (see pt. I.G., *post*), and it does not rise to the level of conflict that would create a due process violation.

Defendant contends he was prejudicially associated with his brother Robert Homick, against whom the evidence was stronger, and with Neil Woodman, because of the amount of evidence regarding Neil's hatred of his parents. "A prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 152.)

Contrary to defendant's assertion, the evidence of his involvement in the Woodman murders was much stronger than that implicating his brother, Robert Homick. Evidence regarding Neil Woodman's hatred of his parents provided the context and motive for defendant's participation and, as defendant concedes, would have been admitted had defendant been tried alone. That it may have been, as defendant contends, "less extensive" at a separate trial does not show defendant was prejudiced as it was clear it was Neil Woodman who hated his parents and wished them dead, not defendant.

Defendant contends the joint trial created a danger of confusion from evidence on multiple counts. (*People v. Boyde*, *supra*, 46 Cal.3d at p. 232.) As defendant concedes, however, the counts would have been the same in a separate

42

trial. He asserts the trial would have been shorter because the evidence presented about Neil Woodman's hatred of his parents would have been less extensive. This is speculative. In any event, defendant points to no authority that supports the proposition that the length of a joint trial is a factor in a due process analysis.

Defendant contends that severance was required because of conflicting defenses presented by Robert Homick and himself.[24] To justify severance "the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' [Citations]." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 150.)

Defendant put forth an alibi defense—that he was in Los Angeles to consult a physician and not to kill the Woodmans—along with the suggestion Robert Homick was more deeply involved with Stewart and Neil and thus the likelier candidate for them to enlist to kill their parents. Robert Homick's defense was that his participation in the murders was the result of defendant's lifelong dominance over him and he did not necessary understand he was abetting murder. Whatever degree of conflict existed between these defenses, the strength of the independent evidence against defendant belies his claim that conflict alone compelled severance.

The independent evidence against defendant includes Stewart's testimony that he and Neil hired defendant to kill their parents after defendant was

---

[24] Although defendant also refers, in passing, to the possibility the jury was "distracted with the need to simultaneously resolve the very different cases against Neil Woodman and Robert Homick," he does not demonstrate any conflict between his defense and Neil Woodman's.

recommended to Stewart by Joey Gambino; defendant's prior relationship with Stewart and Neil; the fact that defendant was the common denominator with respect to virtually every person who had any connection, however incidental, to the crime; the extensive notes in defendant's own hand documenting his connection to his codefendants and his lengthy surveillance of the victims; his recruitment of his codefendants; his acquisition of walkie-talkies, ammunition, and a weapon shortly before the murders; his trip to Los Angeles with Michael Dominguez the day before the murder; his flight back to Las Vegas and his attempt to obtain better walkie-talkies from Art Taylor; Dominguez's testimony that defendant dropped him off near the victims' residence and told him to be on the lookout for them; Rodger Backman's testimony that there were two men in the ivy after the shooting; and defendant's departure with Dominguez from Los Angeles the day after the murder. It was the weight of the evidence against defendant, as to which he offered only weak and implausible defenses, and not conflict with his brother's defense, that proved defendant's guilt. Accordingly, the trial court's denial of his severance motions did not amount to a due process violation.

Defendant argues that the lengthy joint trial consumed "scarce judicial resources." But two or three separate trials, each one requiring many of the same witnesses and the same exhibits would not have been more efficient. Defendant also asserts that he was denied his Sixth Amendment right to present a complete defense because of the exclusion of evidence of an incident where, allegedly, Robert Homick threatened a former employee of Manchester Products at Stewart Woodman's behest, and his right of confrontation due to the extrajudicial statements of his codefendants. For reasons already set forth, we reject these claims. In summary, in full recognition of the high degree of scrutiny required in

44

a capital case (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454), our review of the record leads us to reject defendant's due process claim.

### C. Impeachment of Michael Dominguez with Prior Inconsistent Statements

The prosecution called defendant's confederate, Michael Dominguez, to testify against him. Dominguez claimed that his prior statements admitting his participation in the murders were lies he had been coerced into making by police or prosecutors; asserted his lack of memory; spewed irrelevant information, including information he had been admonished not to disclose; refused to answer questions; and generally behaved in an uncooperative and childish manner. Eventually, the trial court instructed the jury that Dominguez's silence was to be deemed a negative answer to whatever question he had been asked, opening the door to impeachment under the prior inconsistent statement exception to the rule against hearsay. (Evid. Code, § 1235.) Dominguez was impeached by the prosecutor, as well as by counsel for Robert Homick and for defendant, with statements he had made in earlier court proceedings and to police. Defendant complains that the trial court's handling of this difficult and defiant witness violated various constitutional rights.[25]

---

[25] We have recognized exceptions to the forfeiture doctrine with respect to certain constitutional claims raised for the first time on appeal. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) We entertain such claims only to the extent "the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . . [¶] In [this] instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*Boyer*, at p. 441, fn. 17.)

### 1. *Background*

Michael Dominguez was already in custody in Nevada on unrelated charges when defendant and the other codefendants were arrested. In this case, Dominguez pleaded guilty to two counts of first degree murder and admitted the special allegation that a principal was armed with a handgun. In exchange, the prosecution dismissed two conspiracy counts against him and all special circumstance allegations. Dominguez admitted he had been recruited by defendant to take part in the killings; went through extensive planning and preparation with defendant, Robert Homick, and Anthony Majoy; and received $5,000 in payment for his participation. He agreed to testify against his codefendants. He was advised that the prosecution expected his testimony to be "truthful and honest and accurate." He was warned that if the prosecutor determined he had "lied in any material way or that [he] committ[ed] perjury when [he testified], then all of our agreements will be declared null and void." The prosecution agreed that Dominguez would be sentenced on his Nevada charges and on certain federal charges concurrently to whatever sentence he received in this case. It was also represented that, after Dominguez had cleared up this case and his federal cases, he would be housed "in an institution of [his] choice" to keep him separate from his codefendants. Dominguez was ultimately sentenced to two concurrent terms of 25 years to life on the murder counts.

There were three preliminary hearings in this case. Dominguez testified at the first, involving all defendants, and all defendants were held to answer. However, the Court of Appeal ordered the trial court to grant defendant's motion to dismiss the indictments under section 995 because the trial court had conducted an in camera hearing outside the presence of the defense. Dominguez testified at the second preliminary hearing, but defendant was not a part of that proceeding because he was in custody in Nevada on unrelated charges. A third preliminary

46

hearing was conducted, involving defendant alone, but Dominguez refused to testify at this proceeding. His testimony from the first preliminary hearing was read into evidence. Previously, Dominguez had refused to testify at the federal trial of defendant and his codefendants. Subsequently, he refused to testify at the separate state trial of Stewart Woodman and Anthony Majoy.

On November 3, 1992, shortly after trial began, defendant filed a motion to preclude the use of Dominguez's testimony from the first preliminary hearing. At the hearing on that motion, Robert Homick's counsel argued that Dominguez's testimony should be excluded because the terms of Dominguez's plea agreement compelled him to testify he was not the shooter, whether or not that was true, in violation of *People v. Medina* (1974) 41 Cal.App.3d 438. Defendant joined in this argument. The court denied the motion.

Dominguez was called to the stand by the prosecution on Friday, November 13, 1992. The prosecutor began by asking Dominguez whether his plea was free and voluntary. Dominguez responded, "[T]hat was nothing but lies." The prosecutor was permitted to impeach Dominguez with the plea transcript. The prosecutor then turned to Dominguez's statement to police and asked him whether he remembered talking to the investigators on this case, Detectives Holder and Crotsley. Dominguez replied, "I was physically forced into it, that's right." Over defendant's objection, the prosecutor was permitted to impeach Dominguez with the transcript of Dominguez's videotaped statement to police.

As the prosecutor's examination continued, Dominguez claimed forgetfulness and asserted that his prior statements about the murders had been coerced and that they were lies or mere repetitions of what he had been told to say by police, prosecutors, or his former attorney. The prosecutor continued to impeach Dominguez with the transcripts of the preliminary hearings and his statement to police.

47

To impeach Dominguez's claim that the police had coerced his statement, the prosecutor asked to play for the jury the videotape of the interrogation. The tape of the police interview was played for jury at the conclusion of the prosecutor's examination of Dominguez. The court instructed the jury that the purpose of playing the tape was to determine whether Dominguez had been coerced and if it impeached Dominguez "in any respect."

Notwithstanding Dominguez's refusal to answer questions, the trial court declined to find him unavailable. The court explained: "He's not unwilling to speak. He is just refusing to answer questions that are put to him on the subject that the People want to talk about. [¶] But he has a good deal to say. He is present, sworn and available. I can't find him unavailable under these circumstances."

Under questioning by the prosecutor, Dominguez continued to refuse to answer questions. On questioning by Robert Homick's lawyer, Dominguez stated the prosecution had not lived up to its part of the plea agreement, but when asked for details provided none, except to say he had believed he would get out of prison on parole in about 12 years and was unhappy with the plea agreement. He also volunteered information about a series of polygraph examinations he claimed he had been forced to take until he produced answers acceptable to the prosecution, despite having been admonished by the court not to mention such tests.

Later, Dominguez again referred to polygraph tests, leading the court to instruct the jury that there was no issue of polygraph tests in the case and to disregard any such references. Outside the presence of the jury, the court told Dominguez he had no right to refuse to answer questions and would be held in contempt for every question he refused to answer. The court instructed the jury that Dominguez had no privilege to refuse to answer questions, that his "refusal to answer questions is tantamount to answering, 'No' . . . and that Mr. Dominguez

48

may be impeached then, by his prior testimony." The court repeated its instruction that any reference to polygraph tests was to be disregarded.

The prosecutor continued his direct examination, followed by cross-examination by counsel for Robert Homick and for defendant. Dominguez continued his disruptive pattern of interjecting irrelevancies, referring to polygraph tests, claiming lack of memory, sitting mute, and once in a while providing a responsive answer.

### 2. *Analysis*

Defendant argues that the trial court abused its discretion when it allowed Dominguez to be impeached with prior inconsistent statements under Evidence Code section 1235 upon his refusal to answer questions. The Attorney General argues that defendant forfeited this issue because he failed to object on grounds that Evidence Code section 1235 does not apply to a witness who responds to questioning by remaining silent. It appears the Attorney General is correct. This specific objection was not made at trial.

Defendant argues such an objection would have been futile in view of the trial court's denial of other defense objections and mistrial motions made during Dominguez's testimony. The argument is unpersuasive. We cannot presume that, because the court denied some other objections made on different grounds, it would necessarily have denied the specific objection at issue here. Defendant also maintains that the constitutional claims he presents on appeal incorporate the objection he failed to make below. But he did not raise most of those constitutional objections either, and he cannot bootstrap the current claim on their backs simply because, in some limited circumstances, we might entertain constitutional claims not raised below. Finally, he directs us to a page in the transcript involving discussion of a jury instruction regarding Dominguez's refusal

49

to testify, but defense counsel's only comment was to renew a motion for a mistrial on grounds he does not explain. Thus, the claim is forfeited.

The argument also lacks merit. "We review the trial court's rulings on the admission of evidence for abuse of discretion. . . . [¶] 'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.' [Citation.] 'The "fundamental requirement" of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.' [Citation.] ' "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . ." ' [Citation.]" (*People v*. *Cowan* (2010) 50 Cal.4th 401, 462, fn. omitted.)[26] Thus, for example, " '[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]' " (*People v*. *Ledesma* (2006) 39 Cal.4th 641, 711.) Similarly, under the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness

---

[26]     Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

to impeachment under Evidence Code section 1235. (*In re Deon D.* (1989) 208 Cal.App.3d 953, 961.)

In *Deon*, the witness "selectively answered" some questions regarding his participation in a gang rape "and blatantly refused to answer any question he did not want to answer." (*In re Deon D.*, *supra*, 208 Cal.App.3d at p. 959.) The Court of Appeal, citing *People v. Green* (1971) 3 Cal.3d 981, held: "[W]e see no reason to treat Tyrone's blatant refusal to answer specific questions posed by the prosecutor any differently than the *Green* court treated Porter's evasive answers and supposed lapses of memory which stemmed from a desire not to testify. We conclude that under the circumstances of this case the trial court properly concluded that Tyrone's in-court testimony, as well as his refusal to answer questions, was materially inconsistent with his statement" to police incriminating the defendant. (*Deon*, at p. 962.)

*Deon* applies here. This is not a case where a witness took the stand and refused to testify at all, thus providing no basis for the trial court to find inconsistency in effect. (See, e.g., *People v. Rios* (1985) 163 Cal.App.3d 852, 860-861, 864 [Where one witness testified only to his name and the other to his name and age "there is no 'express testimony' at all from which to infer or deduce implied inconsistency."].) Nor, as defendant maintains, is this a case where "nothing specific could be implied from [Dominguez's] silence." From the very outset of his testimony, Dominguez repudiated earlier statements in which he had incriminated himself and defendant in the murders. It soon became obvious that his lapses of memory were feigned, particularly given his repeated refusal to refresh his recollection by examining the relevant document where he had made

51

the statement he claimed not to recall. His refusal to answer questions was simply another tactic in his strategy of denying his prior statements about the crimes.[27]

In these circumstance, we conclude (1) Dominguez's refusal to answer questions was part of his pattern of either repudiating his prior statements as lies or as coerced, or pretending not to remember them, and (2) the trial court did not abuse its discretion by deeming his intermittent refusal to answer questions to be inconsistent in effect with prior statements.[28]

Defendant asserts that even if the trial court did not err by permitting the prosecutor to impeach Dominguez with prior inconsistent statements, it should have stricken all of Dominguez's testimony after he repeatedly refused to answer questions during cross-examination by defendant's attorney, because Dominguez's silence violated defendant's confrontation rights.

"[T]he federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer." (*People v. Carter* (2005) 36 Cal.4th 1114, 1172, citing *United States v.*

---

[27] Defendant maintains that Dominguez's motive in remaining silent was self-serving rather than to benefit defendant. His motive is irrelevant. The question is simply whether his silence was inconsistent in effect with his earlier statements.

[28] Finding no error, we need not address defendant's contention that there was no basis for finding Dominguez unavailable for purposes of admitting his prior testimony, since this argument goes to defendant's prejudice analysis. We also reject defendant's claim that, by making the implied finding Dominguez's silence was inconsistent in effect with his prior statements, thus permitting impeachment under Evidence Code section 1235, the trial court usurped the jury's factfinding function. Admission of inconsistent statements under Evidence Code section 1235 necessarily requires a trial court to make a preliminary finding of inconsistency, otherwise such statements would never be admissible. This case is no more an invasion of the jury's ultimate factfinding function than a case where the trial court determines an "I don't remember" answer is sufficiently inconsistent in effect to permit impeachment with a prior inconsistent statement.

52

*Owens* (1988) 484 U.S. 554, 559.)  As was true of the witness in *People v. Perez* (2000) 82 Cal.App.4th 760, 766, who feigned forgetfulness and was impeached with her statements to the police, Dominguez "testified at length at trial and was subjected to lengthy cross-examination" by both defendant's counsel and Robert Homick's counsel.  While his refusal to answer defendant's counsel's questions "narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements.  This was all the constitutional right to confrontation required."  (*Ibid.*)  Moreover, Dominguez was called by the prosecution and, notwithstanding defendant's assertion to the contrary, to the extent that his behavior on the stand reflected poorly on his credibility, it benefited defendant.  Finally, defendant does not persuasively explain how Dominguez's silence during cross-examination specifically prejudiced his defense.  His general claim—"cross-examination was thwarted in any meaningful sense"—falls short of providing a basis for reversible error.  (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601 ["The burden is on the appellant in every case affirmatively to show error and to show further that the error is prejudicial . . ."].)

Next, defendant asserts the trial court's error of permitting impeachment of Dominguez in the face of his silence was exacerbated by Dominguez's repeated references to polygraph tests.  First, as there was no error, there was no exacerbation of it.  Moreover, it is evident from the transcript that these references were simply more of Dominguez's childish antics.  We doubt the jury would have given the references any weight even had the trial court not specifically instructed the jury to disregard them.  The jury was so instructed, and we presume that it understood and followed that instruction.  (*People v. Avila*, *supra*, 38 Cal.4th at p. 575.)

53

Defendant also contends that the trial court's error was exacerbated when the prosecutor was permitted to play the videotape of Dominguez's police statement to the jury. Defendant concedes that he failed to object on this ground, forfeiting his claim. In any event, the court did not err in permitting the prosecutor to play the videotape to refute Dominguez's claim that he was coerced into making the statement or for its impeachment value as an inconsistent statement, in light of his denials, evasions, feigned forgetfulness, and calculated refusal to answer questions.

Defendant asserts the court erred in allowing the playing of the entire tape because Dominguez did not deny everything he had said during the interview. Dominguez's claim that he was coerced was not limited to certain portions of his police statement and justified playing the entire tape. Additionally, the trial court instructed the jury to "determine whether, *if at all*, it impeaches Mr. Dominguez in any respect," thus allowing the jury to determine which parts, if any, of the videotaped statement were inconsistent with Dominguez's trial testimony. Finally, defendant complains that the trial court erred by allowing the prosecutor to play the tape during his closing argument. Once again, defendant did not object, thus forfeiting the issue. In any event, as the Attorney General points out, the prosecutor is entitled to refer to the evidence in his summation.

### D. Conditions of Michael Dominguez's Plea Agreement with Respect to His Testimony

Defendant contends that Dominguez's testimony was tainted because his plea agreement required him to testify in a manner consistent with his statements to police, whether or not those statements were true.

" '[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a

54

particular fashion.' (*People* v. *Medina*[, *supra*,] 41 Cal.App.3d 438, 455 [116 Cal.Rptr. 133].)  Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction (*People* v. *Green* (1951) 102 Cal.App.2d 831, 837-839 [228 P.2d 867]), the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial.  On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." (*People v. Allen* (1986) 42 Cal.3d 1222, 1251-1252, fn. omitted.)  "[U]nless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina*, *supra*, 41 Cal.[App.]3d 438, and *Green*, *supra*, 102 Cal.App.[2d] 831, are not violated." (*People v. Garrison* (1989) 47 Cal.3d 746, 771; see *People v. Reyes* (2008) 165 Cal.App.4th 426, 435 ["an agreement that binds the witness only to testify truthfully, and not in a prearranged fashion, cannot be deemed invalid."].)  These principles are violated only when the agreement requires the witness to testify to prior statements "regardless of their truth," but not when the truthfulness of those statements is the mutually shared understanding of the witness and the prosecution as the basis for the plea bargain. (*People v. Boyer*, *supra*, 38 Cal.4th at p. 456.)

Dominguez's plea agreement did not require he testify in conformity with his statement to police, but only that he testify in a "truthful and honest and accurate" manner.  Defendant focuses on the condition that if Dominguez was discovered to have lied or committed perjury the agreement would be void. Defendant claims this condition was *Medina* error because any material deviation would necessarily violate one or the other of these possible abrogating conditions. The language defendant cites from the agreement simply spells out the

55

consequences present in every plea agreement conditioned on the witness testifying truthfully; it does not amount to *Medina* error.[29]

Defendant claims that Dominguez's agreement was conditioned on his not being the shooter. No such condition was put on the record in the plea agreement proceedings. Rather, prior to his second interview with Las Vegas police, Dominguez's then lawyer stated it was "the understanding between" the attorney and representatives from the Las Vegas police department and the district attorney's office that Dominguez's possible release on parole "assume[s] he is completely honest, forth right [*sic*]," testified in California and Nevada, "and is not in fact the shooter in any of those murders. *That is not a binding agreement, that is just an understanding we have.*" This preliminary understanding, nonbinding even at the time it was expressed, does not supplant or supplement the actual terms of the later agreement. (*People v. Badgett* (1995) 10 Cal.4th 330, 358 [preliminary discussion of consistency of witness's testimony was not contained in the later immunity agreement: "It is the latter agreement, of course, that is determinative of defendants' claim."].) In any event, even if there were an understanding by the prosecution that Dominguez was not the shooter, this would not have invalidated the agreement.[30] (*People v. Gurule* (2002) 28 Cal.4th 557, 615-616.)

---

**29** Of course, we should also point out that Dominguez did not feel constrained by this agreement when he repudiated his statement to police and his prior testimony. Under these circumstances, what possible injury defendant could be asserting as a result of the alleged error is difficult to see.

**30** Defendant apparently assumes that the prosecution could not, in good faith, have believed Dominguez was not the shooter. He bases this assumption on evidence that Rodger Backman's description of the person he saw fleeing the garage where the shooting occurred matched Dominguez. Defendant ignores Backman's further, adamant testimony that he was "absolutely sure" there were

*(footnote continued on next page)*

### E.  Evidentiary Claims Involving Robert Homick's Defense

Robert Homick's defense to the charges against him was succinctly summarized by his attorney in his closing argument:  "Robert Homick did certain things at the request of his brother [defendant] but he did not know that those things were ultimately going to help in a murder" because "Steven Homick was the leader, Bob was the follower.  Steven Homick ordered, and Bob complied without challenge."  Defendant advances a series of claims in which he contends that the trial court's evidentiary rulings with respect to Robert Homick's defense prejudiced him.

#### 1.  *The "Missouri incident"*

Stewart Woodman testified he specifically told defendant he did not want Robert Homick involved in the plot to kill his parents because he believed Robert Homick was a "klutz" and "I didn't want anything [that could] jeopardize my life in Bob's hands."  To counter this testimony and show that Stewart had used Robert Homick for illegal activities, defendant repeatedly sought to introduce evidence of what the parties called the "Missouri incident."

In 1983, Robert Homick, at the behest of Stewart Woodman, allegedly threw a can of oil through the window of a residence in which Robert Richardson, a former employee of Manchester Industries, was living in Missouri.  He allegedly followed that up with a phone call threatening Richardson that the next object thrown through his window would be a bomb.

---

*(footnote continued from previous page)*

two people running from the garage—the person he saw and another person he heard but could not see.  Given this and the weight of the evidence indicating that defendant was the ringleader in the conspiracy to kill Gerald and Vera Woodman, the prosecutors could have reasonably believed that Dominguez was not the shooter.

Defendant sought to use this evidence during the defense's cross-examination of Stewart Woodman to impeach Stewart's testimony that he did not want Robert Homick involved in the murder conspiracy because of his ineptitude. The court rejected the argument, ruling the Missouri incident was inadmissible character evidence against Robert Homick and that this outweighed any impeachment value as to Stewart's credibility and would divert the trial to a collateral issue. The court cited evidence that Robert Homick had conspired with Stewart Woodman to commit insurance fraud by taking and destroying two vehicles for which Stewart then filed insurance claims and that Robert had made a threat of violence against the owner of a business called Soft Lite, remarking that the Missouri evidence would be cumulative.

Although the trial court did not specifically cite Evidence Code section 352, its ruling clearly rested on that provision. The court weighed the "marginal" or "slim" relevance of the evidence against its prejudicial effect as impermissible character evidence against Robert Homick; found it was cumulative on the point for which defendant wished to introduce it, to impeach Stewart Woodman's testimony that he did not want Robert Homick involved in the murders because of his ineptitude; and also concluded that admission of the evidence would lead to an undue consumption of time on a collateral issue—whether the threat to Richardson was made by Robert Homick or a third party.

Evidence Code section 352 "is not limited by its terms to disputes by opposing parties; it may become applicable to parties on the same side of an action when their interests are adverse to each other." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1007, fn. 10.) "Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [citations], '[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than "slight-

58

relevancy" to the issues presented.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 372.) "Moreover, this court will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless it is shown the trial court exercised its discretion ' "in an arbitrary, capricious or patently absurd manner." ' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 948.)

We find no abuse of discretion here. Contrary to defendant's claim, the trial court never found the Missouri incident to be of significant probative value. It characterized the incident's relevance as "marginal" and "slim," characterizations it never repudiated even when it briefly considered admitting the evidence. The trial court's concern that the evidence would be viewed as evidence of the bad character of Robert Homick, reflecting a propensity to commit crimes, was well founded; such evidence is ordinarily inadmissible because it is prejudicial. (Evid. Code, § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 916.) The court also reasonably concluded that the evidence was also cumulative in light of the evidence of the Soft Lite incident and the insurance fraud schemes. In this connection, we reject defendant's assertion that the Missouri incident evidence was substantially more probative of the point he was trying to make about the relationship between Stewart Woodman and Robert Homick than evidence of these other incidents because, unlike them, evidence of the Missouri incident was "indisputable."[31] The Missouri incident evidence was subject to questions about whether Robert Homick or a third party committed the

---

[31]     Thus, the case before us is distinguishable from *People v. Reeder* (1978) 82 Cal.App.3d 543, where the defendant's evidence of the codefendant's misconduct against the defendant and his family would have shown that the defendant disliked the codefendant and would not have sold drugs with him. That evidence was significantly probative on the issue on which the defendant sought to introduce it. (*Id.* at pp. 550, 553.) The circumstances of the case before us are quite different.

actions against Richardson. For this reason, the trial court also reasonably determined that the evidence would result in an undue consumption of time on a collateral issue—whether the actions against Richardson were done by Robert Homick or a third party.

### 2. *Art Taylor's FBI informant status*

Over defendant's objection, counsel for Robert Homick was allowed to question defendant's erstwhile friend, Art Taylor, about his work as a paid FBI informant. Taylor testified he had gone to the FBI because he was upset that defendant had been using him to help distribute drugs. Robert Homick's counsel sought to impeach Taylor by suggesting his motivation for becoming an informant was to enlist the FBI's help in removing tax liens from his business. The trial court allowed the evidence but instructed the jury, both after Taylor's testimony and at the close of the guilt phase, that evidence regarding defendant's alleged drug dealing was to be considered only as it affected Taylor's credibility and not as evidence of defendant's bad character.

Defendant contends the trial court erred by allowing Taylor to be questioned about his motivation for becoming an FBI informant in a manner that disclosed his belief that defendant was a drug dealer. He maintains the limiting instructions were inadequate to dispel any prejudice.

We find no abuse of discretion. Taylor's status as a paid FBI informant was relevant to his credibility, a point acknowledged by defendant's own trial attorney, who simply wanted to avoid disclosure of the fact that Taylor was informing on defendant. Equally relevant to Taylor's credibility was whether he had become an informant because, as he claimed, he was upset that defendant had involved him in drug distribution or for other reasons unrelated to defendant's alleged drug dealing, e.g., to get tax liens removed from his business or to make

money.  Taylor's motive, may, for the jury, have spelled the difference between being civic minded and self-interested.  Therefore, the court did not abuse its discretion by allowing questioning on that point for the limited purpose of providing information to the jury with which to fully assess Taylor's credibility.

The trial court's repeated admonitions to the jury that the evidence could be used not as evidence of defendant's character or propensity, but only on the issue of Taylor's credibility, cured any potential prejudice to defendant.  We reject as entirely speculative defendant's assertion that these limiting instructions were inadequate.  "Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury.  We presume that jurors comprehend and accept the court's directions. [Citation.]  We can, of course, do nothing else.  The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

### 3. *Judge Stromwall's testimony*

The prosecution presented evidence that the day before the murders, defendant, accompanied by Michael Dominguez, visited a lawyer named Max Herman, from whom defendant may have obtained a gun.  To bolster his point that defendant used people without disclosing his purpose, Robert Homick presented the testimony of retired Superior Court Judge Clarence Stromwall, a longtime friend of Herman with whom he had worked when they were both members of the Los Angeles Police Department.  Homick hoped to show that even Herman, who Stromwall agreed was "a streetwise person," could be duped by defendant into helping him engage in illegal activity.  Defendant's counsel objected.  He argued

61

the evidence was being used to show defendant's bad character "for deception and deceit." The trial court overruled the objection.

Defendant contends the Stromwall testimony constituted impermissible character evidence. (Evid. Code, § 1101, subd. (a).) Specifically, he asserts "it was improper to admit Judge Stromwall's opinion of Max Herman's character trait of honesty . . . to prove . . . that Max Herman did not give a gun to [defendant] . . . with knowledge that the gun was going to be used in a crime."

Defendant's objection to Stromwall's testimony in the trial court, however, was not that it showed Herman's specific conduct in conformity to his character trait for honesty, but that it showed defendant's bad character as deceitful and manipulative. Therefore, defendant has forfeited the claim he now attempts to advance on appeal. (Evid. Code, § 353; *People v. Ramos* (1997) 15 Cal.4th 1133, 1171.) In any event, the claim lacks merit. It is clear from the record that the purpose of the evidence was to show defendant manipulated people for purposes of which they might not have been entirely aware, and not to prove that Herman acted in conformity with a particular character trait. To the extent defendant's complaint is that the trial court abused its discretion by admitting the evidence under Evidence Code section 352, we find no abuse where, as the court noted, the evidence was strongly relevant to Robert Homick's defense as compared to any prejudice to defendant.

### 4. *Helen Copitka's Testimony*

Robert Homick called his and defendant's sister, Helen Copitka, to testify about the childhood dynamics within their family and specifically defendant's domineering relationship with his younger brother. Defendant objected that the testimony was inadmissible character evidence and, because Copitka had had few interactions with her brothers in adulthood, her testimony would be stale. The

court overruled the objections, finding, as to the latter contention, that Copitka's lack of adult interactions with her brothers went to the weight, not the admissibility, of her testimony. The trial court also rejected defendant's request to impeach Copitka's testimony with evidence of the Missouri incident.

Defendant contends that Copitka's testimony was of little relevance because of her limited interactions with her adult brothers; that it was more prejudicial to defendant than probative; that Robert Homick's defense—that he simply followed defendant's orders, unaware of defendant's purpose—was without support in the evidence; and that, if testimony about the brothers' leader/follower relationship was relevant, the trial court should have allowed defendant to present the Missouri incident evidence. His contentions are meritless.

Copitka's testimony about defendant's dominance in his relationship with his brother, established when both were children, was clearly relevant to Robert Homick's defense that he carried out defendant's instructions in the instant case without necessarily understanding their purpose. Her limited interaction with her brothers as adults and, thus, her opportunity to observe their adult relationship, went to the weight, not the admissibility, of her testimony. "Relevant evidence is evidence 'having any *tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210, italics added.) The evidence need not be dispositive of the disputed fact." (*People v. Richardson* (2008) 43 Cal.4th 959, 1002.) Defendant's assertion that there was no evidence to support Robert Homick's defense, and thus no basis for Copitka's testimony, is puzzling, to say the least, given defendant's objections to some of the evidence presented in support of that defense. That defendant found his brother's defense implausible—as apparently did the jury—does not mean there was no evidentiary basis for it. Finally, we have already concluded that the trial court

63

properly excluded the Missouri incident evidence under Evidence Code section 352.

### 5. *References to Las Vegas triple murder investigation*

During the presentation of Robert Homick's defense, Detective Holder, one of the investigating officers in this case, testified that no deal had been made with Michael Dominguez when he was interviewed in March 1986, first by Holder and his partner Detective Crotsley and then by members of the Las Vegas police department. Counsel for Robert Homick was then permitted to play the tape of the Las Vegas police department interview, at which Holder was also present. A comment was made at the beginning of the tape that the Las Vegas police were investigating a triple murder. Dominguez's attorney then spoke of a tentative plea agreement with the Los Angeles police department. Confronted with the tape, Holder acknowledged his recollection about whether a deal had been reached was incorrect. Subsequently, when the prosecutor cross-examined Holder, further reference was made to a "triple homicide" the Las Vegas police had been investigating at the time of the interviews.[32]

Defendant moved for a mistrial, arguing that the jury would have inferred defendant had something to do with the triple murders. The court denied the motion, remarking, "I see nothing in that that would even, under rank speculation, tie that in to any defendant in this case." Defendant argues the jury must

---

[32]     The triple murders at issue were the Tipton murders of which defendant was convicted in Nevada. Before Robert Homick was allowed to question Holder about the Dominguez interviews, the trial court explicitly directed the prosecution not to refer to the homicides as the "Tipton murders" or to mention defendant in connection with them.

inevitably have connected him to the triple murder investigation mentioned during Holder's testimony. We agree with the trial court that the argument is speculative.

Finally, having rejected defendant's various individual claims of error, we necessarily reject his claim that the cumulative prejudicial effect of the errors requires reversal. (*People v. Panah* (2005) 35 Cal.4th 395, 479-480.)

## F. Coconspirator Statements

Defendant contends that the trial court erroneously admitted statements by his confederates under the coconspirator exception to the rule against hearsay. (Evid. Code, § 1223 ["Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime . . . and in furtherance of the objective of that conspiracy; [and] [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy . . ."].)

### 1. *Soft Lite incident*

The prosecution introduced evidence that, at Stewart Woodman's behest, Robert Homick went to Soft Lite, a business owned by Jack Swartz, and threatened him over money Soft Lite owed to Manchester Products. The evidence came in through the testimony of Swartz's daughter, Tracy Swartz Hebard. Just before she testified, defendant's counsel objected to her testimony because "there's no showing that [the Soft Lite incident] is part of any conspiracy dealing with the death[s] of Gerald and Vera Woodman." The court rejected the argument, ruling that the evidence was relevant to demonstrate the relationship between the defendants "during the years leading up to the 1985 murder[s]." Defendant's counsel asked for an instruction to limit the evidence to Robert

65

Homick. The court agreed to listen to the evidence and "if it is apparent that it bears no relationship to [defendant] I will so instruct the jury."

Defendant contends the evidence should have been excluded as irrelevant and prejudicial. While he concedes the evidence was more harmful to his brother, he argues he suffered "some prejudice" because there was "an inevitable tendency" for evidence harmful to one of them to be "considered by the jury as harmful to both." He also complains that the court failed to give the limiting instruction he had earlier requested, thus compounding any prejudice, although he acknowledges such prejudice alone "may not have been sufficient to require reversal of the judgment against" him.

Defendant has lumped this claim into his general claim that the trial court misapplied the coconspirator hearsay exception, even though no party made a hearsay objection to this particular evidence. Accordingly, any hearsay claim is forfeited.

We reject on its merits defendant's claim that the evidence was irrelevant. "Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy. (*People v. Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994; see §§ 182, subd. (a)(1), 184.) A conspiracy requires (1) the intent to agree, and (2) the intent to commit the underlying substantive offense." (*People v. Bogan* (2007) 152 Cal.App.4th 1070, 1074.) " 'The punishable act, or the very crux, of a criminal conspiracy is the evil or corrupt agreement.' " (*People v. Alleyne* (2000) 82 Cal.App.4th 1256, 1262.)

If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially. " 'The

existence of a conspiracy may be inferred from the conduct, *relationship*, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, italics added.) Thus, the trial court did not abuse its discretion when it admitted Hebard's testimony as relevant to establish the relationship between Robert Homick and Stewart Woodman.

Nor did the trial court abuse its discretion when it found that the evidence was more probative than prejudicial. The court characterized Robert Homick's threat as "a lot like puffing" and unlikely to have been taken at face value by the jury. If, for this reason, the testimony was minimally prejudicial to Robert Homick, then, necessarily, it was not prejudicial at all to defendant who was not involved in the incident and whose name did not surface during Hebard's testimony. Regarding defendant's complaint about the court's failure to give a limiting instruction, defendant's failure to press the court for a ruling once Hebard gave her testimony forfeits any claim of error. (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 554.) In any event, defendant was not prejudiced by the trial court's failure to give such an instruction. The incident, on its face, simply had nothing to do with him, which the jury would have understood even without an instruction to that effect.

### 2. *Statements made by Stewart and Neil about defendant*

Over defendant's objection, the trial court permitted two former employees of Manchester Products to testify to statements made by Stewart and Neil about defendant on grounds they were made during a time the conspiracy was in existence. Cathy Clemente testified that, sometime in March or April of 1983, the brothers had a meeting with defendant after which Stewart described defendant as "his man in Vegas" and added that, if anything needed doing, defendant "was the

67

man to do it." Neil told her that defendant was "tougher" than the Mafia. Richard Wilson testified that on many occasions Neil had told him defendant "could get anything done of an illegal nature upon request." In his in limine testimony, though not in his trial testimony, Wilson identified the timeframe of these statements as 1984 and 1985.

"Hearsay evidence is of course generally inadmissible. (Evid. Code, § 1200.) Hearsay statements by coconspirators, however, may nonetheless be admitted against a party if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' [Citation.]" (*People v. Hardy* (1992) 2 Cal.4th 86, 139.)

Defendant contends, correctly, that Stewart's and Neil's statements to Clemente took place before the conspiracy to kill Gerald and Vera was formed and were therefore inadmissible under the coconspirator exception. The trial court concluded the conspiracy was formed no earlier than the fall of 1983 when, as Stewart testified at the federal trial, Joey Gambino suggested he speak to defendant about Stewart's problem with his father, whereas Clemente testified the statements to her were made in March or April 1983. Thus, the trial court erred when it admitted Clemente's testimony under the coconspirator statement exception because the foundational requirements—"[t]he statement was made by the declarant while participating in a conspiracy to commit a crime . . . and in furtherance of the objective of that conspiracy" (Evid. Code, § 1223, subd. (a))—

68

were not met. Nevertheless we conclude any error in the admission of Clemente's brief testimony was harmless in light of the strong evidence of defendant's guilt. (*People v. Watson* (1956) 46 Cal.2d 818.)

Defendant concedes Neil Woodman's comment to Richard Wilson was made after the conspiracy came into existence, but argues it was not in furtherance of that conspiracy. As the Attorney General asserts, the trial court found otherwise; that finding binds us only if supported by substantial evidence. (*People v. Roberts* (1992) 2 Cal.4th 271, 303-304.) The court cited no such evidence, and we find none. There is no apparent connection between Neil's statement to Wilson about defendant's ability to commit illegal acts and the specific objective of the conspiracy to kill Gerald and Vera. Neil was not enlisting Wilson's assistance nor attempting to procure his silence; he seems simply to have been bragging about his connection to a dangerous man. (See *id.* at p. 304 [coconspirator's remark to third parties that he was going with defendant to the prison yard the next morning to resolve a dispute with the victim was not in furtherance of the conspiracy to assault the victim where "Menefield was not asking Rooks or Long for help"].) Again, however, we find this fleeting comment nonprejudicial in light of the strong evidence of defendant's guilt.

### 3. *Neil Woodman's comments on a magazine article about hiring a hit man*

Gloria Karns, Stewart and Neil's aunt, testified that while waiting for a deposition at her attorney's office in connection with her lawsuit against the brothers, Neil flipped through a magazine and came across an article entitled "This Gun for Hire." He remarked to his attorney, loudly enough for Karns to hear, "When somebody annoys you, you can look in a magazine [and] find someone to stop them annoying you." At an in limine hearing, defendant argued that even if the testimony was admissible against Neil, it was inadmissible against defendant

69

and should be excluded. Alternatively, he argued the court should give an instruction limiting the jury's consideration of the testimony to Neil. The prosecutor opposed any limiting instruction on the ground that the statement, made in 1984, constituted proof of the existence of the conspiracy to murder Gerald and Vera. The trial court agreed and declined to give a limiting instruction. Defendant maintains the trial court erred because the statement was not made in furtherance of the conspiracy.

Assuming the testimony should have been excluded or a limiting instruction given, defendant was not prejudiced. Neil's comment, made in the midst of an acrimonious legal dispute with his aunt, was clearly directed at her, was unrelated to the conspiracy to murder his parents, and did not name defendant, expressly or by implication.

### 4. *Stewart's and Neil's comments to Jack Ridout*

Jack Ridout, a business associate of Stewart and Neil's, testified about two conversations with the brothers. In one, Stewart told Ridout he used defendant for collections. He said he had sent defendant to take care of someone in Florida with whom the company was having problems getting paid and "they got paid right away." In the other, when Ridout complained about a custody dispute with his ex-wife, Neil suggested that "he could have her hit, and all problems would be over with."

We need not resolve whether admission of Stewart's comment was error, because any error was harmless. Other testimony established that Stewart and Neil employed defendant for various jobs, including providing security and installing listening devices. The additional testimony that defendant was also employed to do collections was cumulative and insignificant in light of the strong evidence of his guilt.

70

As to Neil's statement, the trial court gave a limiting instruction expressly informing the jury it was not to consider the statement against defendant. We presume the jury understood and followed the instruction. (*People v. Avila*, *supra*, 38 Cal.4th at p. 575.) Defendant complains that the limiting instruction was given long after the testimony and this diluted its effect. "[T]he trial court is not obliged to give limiting instructions the moment they are requested or when the limited evidence is presented; subsequent instruction can be sufficient in a proper case." (*People v. Dennis* (1998) 17 Cal.4th 468, 534.) We perceive no abuse of discretion here. Defendant also suggests the instruction was inadequate.[33] We disagree and, in any event, defendant failed to suggest a different instruction be given.

### 5. *Neil Woodman's postarrest call to Steven Strawn*

Steven Strawn, Manchester Products's former controller, testified that after his arrest Neil Woodman called him from jail and asked him to destroy business cards located beneath Neil's desk; two of the cards belonged to defendant. Defendant objected that Neil's statement inculpated him in violation of the *Aranda-Bruton* rule. (*People v. Aranda*, *supra*, 63 Cal.2d 518; *Bruton v. United States*, *supra*, 391 U.S. 123 [a nontestifying codefendant's extrajudicial statement that incriminates himself or herself and the other defendant is inadmissible].) The trial court concluded that any potential prejudice to defendant could be cured by a

---

[33] The jury was instructed in pertinent part: "With respect to the 2 statements that were testified to by Mr. Ridout, one statement that Neil Woodman could have Mr. Ridout's ex-wife hit . . . these statements were admitted in evidence against Neil Woodman only, and they are not admitted against Robert Homick, or Steven Homick. [¶] Whether the statements were in fact made by Neil Woodman, and the weight, if any, to be given them, are matters for the jury to decide. However, they are not to be considered by you as evidence against Steven or Robert Homick."

limiting instruction. It instructed the jury: "[E]vidence concerning Neil Woodman's telephone instructions to Steven Strawn, if believed by you, is to be considered only as it applies to Neil Woodman. It may not be considered in any fashion with respect to Steve Homick." Defendant contends the limiting instruction was inadequate.

"*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation]." (*People v. Jennings* (2010) 50 Cal.4th 616, 652.)[34] The United States Supreme Court "limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 [95 L.Ed.2d 176, 107 S.Ct. 1702] . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson*, *supra*, at pp. 206-207.) That is because, '[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.' (*Id.* at p. 208.)" (*People v. Lewis*, *supra*, 43 Cal.4th at p. 454; see *People v. Fletcher*, *supra*, 13 Cal.4th at pp. 463-464 [*Richardson* limits application of *Bruton* exception to facially incriminating confessions of codefendant at a joint trial].)

---

[34]    To the extent *Aranda* "require[d] the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

Neil's statement to Strawn was not a confession, much less one that facially incriminated defendant. Its incriminatory effect on defendant depended entirely on its linkage to other evidence. As the trial court aptly noted, this was not a *Bruton/Aranda* issue "in a true sense," and any possible prejudice to defendant could be dispelled by a limiting instruction. (*Richardson v. Marsh*, *supra*, 481 U.S. at p. 206 ["Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."].)

### 6. *The "heavy guy" comment*

During defense counsel's cross-examination of Steven Strawn, Strawn testified that Stewart had ridiculed Neil's friendship with defendant. On redirect examination, Strawn explained that Stewart thought "Neil seeing [defendant] as a, quote, heavy guy went beyond the limits when Neil would use this in conversations with other people . . . ." Defense counsel objected that the "heavy guy" characterization violated the court's earlier ruling prohibiting the prosecutor from eliciting such testimony from Strawn. The court observed the comment "just sort of came out of left field." Neil's counsel observed, "It came in as innocuously as possible and it was gone." Although he concedes the error was "relatively minor," defendant renews his objection to bolster his claim that the cumulative prejudice from all the evidentiary errors raised in this part requires reversal. There was no error here. The prosecutor did not solicit this testimony, nor did the court permit it. It slipped out of the witness in passing. Defendant could have, but did

not, request an admonition to the jury to disregard the phrase, probably because an admonition would simply have called attention to the innocuous remark.[35]

### G.  Other Claims of Evidentiary Error

#### 1.  *Art Taylor's testimony that defendant habitually carried a revolver*

The defense sought to preclude testimony by Art Taylor that he had seen defendant carrying a revolver.  The prosecutor argued Taylor's testimony would be relevant to anticipated testimony by another witness, Robert Kelly.  Kelly, who heard the shooting, believed the weapon used was a revolver, based, apparently, on his knowledge of firearms.  The trial court overruled the objection.  Taylor testified briefly that defendant usually carried a briefcase and among its contents was a silver revolver.  Robert Kelly did not testify about the type of weapon he thought was used in the shooting.

Later, however, evidence was presented that Michael Dominguez saw a silver revolver in the gun case defendant had obtained from Max Herman.  In closing argument, the prosecutor suggested this revolver might have been the

---

[35]  Here, as elsewhere, defendant asserts the cumulative effect of prejudice from the erroneous admission of the evidence requires reversal.  Where we have identified an error, we have concluded there was no prejudice.  We conclude this is true whether the claims of prejudice are viewed individually or in the aggregate. This was not a close case.  There was direct testimony from Stewart Woodman that he and his brother hired defendant to kill their parents.  This testimony was corroborated by ample evidence that defendant personally stalked the victims and gathered confederates to help him accomplish the crime.  Against this overwhelming evidence, defendant offered a weak alibi defense and attempted to point the finger of blame at his brother, who the evidence strongly indicated was defendant's pawn.  The occasional evidentiary error defendant points to could not have had a prejudicial impact sufficient to require reversal.  (See Evid. Code, § 353, subd. (b) [no reversal for erroneous admission of evidence unless "[t]he court which passes upon the effect of the error or errors is of the opinion . . . that the error or errors complained of resulted in a miscarriage of justice."].)

murder weapon. When counsel for Robert Homick directly argued that it was the murder weapon, the court interrupted his argument and instructed the jury that, while it could draw reasonable inferences from the evidence, "I don't think there's been evidence tying a particular weapon to being the murder weapon."

Defendant contends the trial court erred by permitting Taylor to testify to defendant's habitual possession of a weapon, citing *People v. Riser* (1956) 47 Cal.2d 566. In *Riser*, we held: "When the prosecution relies, . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 577.) On the other hand, "[w]e have also held that when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapons, they may still be admissible." (*People v. Cox* (2003) 30 Cal.4th 916, 956.) For example, in *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052, we held the trial court did not abuse its discretion by allowing a witness to testify the defendant had told her he kept a gun in his van. "Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. . . . The evidence was thus relevant and admissible as circumstantial evidence that [the defendant] committed the charged offenses." (*Ibid.*; see also *People v. Neely* (1993) 6 Cal.4th 877, 896 [counsel not ineffective for failing to object to admission of rifle and ammunition found in defendant's truck shortly after commission of crime where "there was no direct evidence as to the fatal shooting

75

that would render this evidence irrelevant to establish facts material to proof of the charged offenses"].)[36]

Here, the prosecutor's offer of proof in support of Taylor's testimony was that the weapon defendant habitually carried may have been the same type of weapon used in the shooting. As the trial court observed, such evidence was "circumstantial evidence the jury can use to determine whether the case is proven that this defendant is connected to the murder." The court acknowledged the testimony was prejudicial but nonetheless, by overruling defendant's objection, implicitly found the testimony was more probative than prejudicial. We cannot conclude that the court abused its discretion in admitting the testimony. (*People v. Cox*, *supra*, 30 Cal.4th at p. 955.)

Defendant maintains the prosecutor ultimately pointed to another revolver—that obtained by defendant from Max Herman—as the murder weapon. As noted, however, the prosecutor's argument was not so direct, and the trial court specifically instructed the jury that no particular weapon had been identified as the

---

[36] Defendant argues that defendants are held to a higher standard of relevance when attempting to introduce reasonable doubt evidence than is the prosecution when it offers weapons evidence. He cites *People v. Hall* (1986) 41 Cal.3d 826, which involves a defendant's tender of third party culpability evidence. In *Hall*, we overruled earlier authority that had held such evidence was inadmissible absent a threshold showing of substantial proof of probability because that standard was too onerous. (*Id.* at pp. 832-834.) While we acknowledged some outer limits to guide the trial court's exercise of discretion—"direct or circumstantial evidence linking the third person to the actual perpetration of the crime" (*id.* at p. 833)—we also observed that whether such evidence was admissible "will always turn on the facts of the case" (*id.* at p. 834). The same is true of weapons evidence because (1) some degree of connection between the weapon and the crime must be shown before it is admissible, but (2) this determination turns on the facts of the individual case. Therefore, we reject defendant's suggestion that different rules apply to the defense as opposed to the prosecution regarding the admission of this evidence.

76

murder weapon, while leaving the jury free to draw reasonable inferences. Even had the prosecutor ultimately argued the gun obtained from Herman was the murder weapon, the effect would have been to render Taylor's testimony irrelevant; the trial court's ruling would still have been correct based on the offer of proof made at the time of its ruling. Moreover, defendant could have, but did not, request that Taylor's testimony be stricken or otherwise renew his objection.

### 2. *Stewart Woodman's testimony regarding Robert Homick's presence outside Gerald and Vera's apartment building*

Defendant sought to exclude testimony by Stewart Woodman that Robert Homick had told him it was a coincidence he was parked outside Gerald and Vera's apartment building for several hours on June 22, 1985, Gerald and Vera's anniversary. While defendant's counsel conceded the statement was admissible against Robert Homick, he argued it was harmful to defendant, who planned to argue, in essence, that Robert was engaged in a plot to kill the victims on June 22, when defendant was not in Los Angeles. The trial court declined to exclude the testimony. Defense counsel again sought to exclude the testimony after Stewart had taken the stand. In response, the prosecutor argued: "My position is this is incriminating against Bob Homick because it shows there was a pattern of surveilling the victims in this case." Defense counsel offered to stipulate to Robert Homick's statement he was at the scene on June 22, as well as before and after that date. The trial court again overruled the objection to the testimony.

Defendant contends admission of the testimony was error. Not so. The testimony was admissible against Robert Homick to show he had been surveilling the victims. Robert Homick's claim to Stewart Woodman that it was simply a coincidence he had been outside the building did not fatally undermine defendant's assertion that his brother, and not he, was the designated hit man. Defendant was free to attack Robert Homick's truthfulness on this point. Nor was

77

the prosecution obligated to accept defendant's tender of a stipulation. " '[T]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness.' " (*People v. Arias* (1996) 13 Cal.4th 92, 131.) Defendant also complains that a limiting instruction was not given with respect to this evidence but, as he did not request such an instruction, his complaint fails. (See *People v. Daniels* (1991) 52 Cal.3d 815, 883-884.) Accordingly, we conclude the trial court did not abuse its discretion in admitting this fleeting testimony.

### 3. *FBI Agent Joseph Gersky's testimony that he believed Michael Dominguez and Gersky's characterization of defendant as "notorious"*

Robert Homick called FBI Agent Joseph Gersky to testify that when he initially interviewed Michael Dominguez, Dominguez told him he did not know who else had participated in the Woodman murders.[37] Gersky testified that, an hour or so later, he again interrogated Dominguez because he did not believe him. In the second interview, Dominguez told Gersky two other men had assisted defendant, Anthony Majoy and defendant's brother, William, also known as "Moke." On cross-examination, the prosecutor elicited testimony from Gersky that what Dominguez had actually said during the second interview was that Majoy and "Steve's brother" had participated in the murders, without specifying which brother. Over defendant's objection, the prosecutor was also allowed to ask Gersky if he believed Dominguez. Gersky said he did.

---

[37] Gersky was also a polygraph examiner who evidently gave Dominguez a polygraph test.

Defendant contends the trial court erred by permitting Gersky to testify that he believed Dominguez after the second interrogation. "Even assuming these opinions were improperly admitted (see *People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741] [opinion testimony from a witness with no personal knowledge of the events regarding the veracity of another witness's statements regarding those events is inadmissible because such testimony is speculative]; but see *People v. Padilla* (1995) 11 Cal.4th 891, 946-947 [47 Cal.Rptr.2d 426, 906 P.2d 388] [declining to decide whether this aspect of *Melton* survived Prop. 8]), we nonetheless conclude that any [error] . . . was not prejudicial." (*People v. Riggs* (2008) 44 Cal.4th 248, 300.) Gersky's brief testimony involved a subject—defendant and his brother's participation in the murders—as to which there was ample evidence.[38] Neither the court nor the prosecutor drew any further attention to Gersky's testimony, and the jury was instructed that it alone was to determine witness credibility. We presume the jury followed this instruction. (See *Riggs*, at pp. 300-301 [where the jury was instructed it was to determine the credibility of witnesses, any error in an officer's testimony about defendant's veracity was harmless].)

---

[38]    Defendant maintains that Gersky's opinion about Dominguez's credibility was based on the polygraph examination Gersky administered to him. He complains about not being able to question Gersky about the results of that examination. Such results are inadmissible. (Evid. Code, § 351.1.) Moreover, the basis for Gersky's opinion that Dominguez was being truthful when he said defendant and one of his brothers had participated in the offense is unimportant in light of the overwhelming evidence that otherwise established this point. Indeed, Gersky's opinion of Dominguez's credibility was itself insignificant given the jury's ability to observe Dominguez's demeanor. As the trial court aptly remarked, "the jury's determination about the credibility of Michael Dominguez is not going to depend on whether this witness believed him or not."

79

During redirect examination by counsel for Robert Homick, Gersky was asked whether he was aware defendant was arrested on March 11, 1986. He replied: "Well, I knew Steven Homick had been arrested, because he was a notorious person." Defendant's counsel quickly moved to strike that response. His motion was granted, and the court instructed the jury to disregard the remark. He also sought a mistrial, which the court denied. Defendant contends, in effect, that the court should have granted his mistrial motion because striking the remark was insufficient to dispel the prejudice to defendant. We do not agree. The comment was made in passing, the court's response was instantaneous, and we presume the jury followed its instruction to disregard the remark.

### 4. *Michael Dominguez's testimony that he believed defendant intended to kill Gerald and Vera Woodman*

To impeach Michael Dominguez's testimony that his statement to police had been coerced, the prosecution was allowed to play the videotape of the interrogation. On the tape, Dominguez said he believed defendant had planned to kill the victims, even though defendant had told him only a robbery was planned. Defense counsel objected to evidence of Dominguez's "belief that . . . these people were going to get shot based on being with [defendant] and what [defendant] had done," and Dominguez's interpretation of defendant's use of the phrase "to catch up with them," as meaning "[t]o kill [the victims]." The trial court overruled the objection, concluding the statement would impeach any claim by Dominguez that he did not know there would be a murder. The court also observed that Dominguez's belief that a murder was planned was an opinion not based on anything defendant had said to him.

Defendant argues that Dominguez's statement did not impeach his trial testimony because Dominguez did not testify he believed defendant intended only a robbery and not a murder. Rather, Dominguez testified he was not in Los

80

Angeles at all, implying he had no knowledge of any crime.[39] Defendant asserts further that Dominguez's opinion about what defendant intended was irrelevant to any issue in the case.

The statements at issue tended generally to impeach Dominguez's denial that he was involved in any crime by demonstrating an awareness on his part that some crime against the victims was planned. Moreover, as the Attorney General points out, Dominguez's belief appears to have been based on his observations of defendant's planning activity—his attempt to acquire an apartment in a nearby building and his long-term surveillance of the victims—and not on any admission by defendant or on Dominguez's assessment of defendant's character. Accordingly, we find no abuse of discretion.

Defendant suggests the cumulative prejudice from the evidentiary rulings discussed above requires reversal. As we have found either no error or no prejudice, we also conclude he was not cumulatively prejudiced.

## H. Denial of Defendant's Motion to Reopen and Present Evidence After All Sides Had Rested

After all sides had rested, but before closing arguments began, defendant's lawyers met with the court in an ex parte session. They claimed that a gun recovered by police from Robert Homick's residence, which police had test-fired and determined was *not* the murder weapon, was, according to defendant, the same gun he had acquired from Max Herman.[40] Herman's description of the gun

---

[39] When asked why defendant wanted him to come to Los Angeles, Dominguez testified he did not recall being in Los Angeles.

[40] Counsel acknowledged there was no evidence, other than defendant's claim, that the weapon retrieved from Robert Homick's apartment was the weapon defendant obtained from Herman. Herman died before trial.

to police, defendant's counsel asserted, fit the description of the gun seized from Robert Homick's apartment and the serial number of the two guns matched.

The defense wanted to reopen to ask the detectives whether they had asked Herman if he still had the serial number of the weapon he gave defendant, so it could be compared with the number of the gun seized from Robert's apartment, or if they had shown Herman the seized weapon and asked him if it was the gun he had given to defendant.

Alternatively, the defense proposed a stipulation that stated, in part: "Detectives Crotsley & Holder did not ask Mr. Herman for the serial number & never showed him the .357 magnum [recovered from Robert Homick's apartment] to see if he could identify it as the gun he had given [defendant]." After considerable discussion, the trial court concluded the proffered evidence was not "sufficiently significant to do anything more about it, other than to leave the evidence in the state it's in." It denied defendant's requests to reopen for a stipulation or a mistrial.

A "motion to reopen [is] one addressed to the [trial] court's sound discretion." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1202.) In determining whether an abuse of discretion occurred, the reviewing court considers four factors: " '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' " (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

The court found the proffered evidence—that is, defendant's desire to question the investigating detectives about whether they had talked to Herman about the serial number of the gun he had given defendant and had shown him the test-fired gun for comparison—"[in]sufficiently significant" to warrant reopening.

82

This finding corresponds to the fourth factor of our abuse of discretion analysis. If the trial court was correct regarding the insignificance of the evidence, it could not have abused its discretion by denying defendant's motion to reopen and present it.

Only defendant's unsworn statement to his lawyers that the gun seized from Robert Homick's apartment was the same gun Max Herman had given him directly connected the two weapons. Herman's statement to police did not establish the connection. Herman merely supplied a description of a gun similar to the gun seized from the apartment. There was no evidence the serial number of the gun he gave defendant matched the serial number of the gun seized from the apartment.

At most, then, the only evidence potentially favorable to his case defendant could have presented on this point was that the investigating detectives (1) did not ask Herman whether he had kept the serial number of the gun he gave defendant and (2) did not show him a gun seized during a police search and ask him if he could identify it as the weapon he gave defendant. If, to the contrary, the detectives testified they did ask Herman about these matters, that response would have indicated Herman did not know the serial number and/or did not recognize the seized weapon because, had he done either, the police would certainly have included that information in their reports. In either scenario, the testimony would not have materially assisted the defense. We agree with the trial court that the proffered evidence was insufficiently significant to warrant reopening the evidence.

Based on our analysis of the value of the proffered evidence, we also conclude the trial court did not abuse its discretion when it denied defendant's motion for a mistrial. (*People v. Avila*, *supra*, 38 Cal.4th at p. 573.) For the same reason, we reject defendant's claim that he was entitled to lesser relief, in the form of a stipulation.

83

## I. The Trial Court's Statement About the Federal Trial

At the outset of the trial, the court directed counsel to instruct their witnesses not to mention whether they had testified in defendant's federal trial. During cross-examination of Art Taylor by counsel for Robert Homick, Taylor twice mentioned he had testified at that trial. After his testimony, defendant's counsel briefly moved for a mistrial. The motion was summarily denied.

About two months after this brief exchange, before Stewart Woodman took the stand, the trial court distributed to counsel a "proposed statement" it wanted to give the jury providing background about Stewart Woodman, including information about the federal case. Defendant's counsel's sole input was to object to the statement that Anthony Majoy had been tried along with Stewart Woodman. Just before Stewart Woodman testified, the trial court reminded counsel about its intention to "give [the jury] an instruction" in advance of his testimony and asked counsel "to be prepared to tell me if you have any modifications to my proposed instruction to them." When court reconvened, the trial court pressed for any additional modifications to "the statement that I am going to read to the jury." Defendant's counsel offered none.

When the jury returned to the courtroom, the trial court read the following statement: "The next witness who is going to be called to testify for the prosecution is Mr. Stewart Woodman. [¶] Mr. Woodman is presently in custody and he'll be brought to court accompanied by marshals. [¶] Before he testifies, I want to give you some information about some background on this case. [¶] After the defendants were arrested for the murders charged in this case, a severance was ordered by the court. The trial of Stewart Woodman was severed from the trial of the three defendants who are presently on trial here. He was tried before a jury and in 1989 and 1990 and was convicted of the murders. [¶] Before the commencement of the penalty phase of that trial, Stewart Woodman entered into

84

an agreement with the prosecution whereby he promised to testify against the remaining defendants in this trial and the prosecution agreed not to seek the death penalty against him but to accede to his being sentenced to life in prison without the possibility of parole. [¶] Thereafter, federal authorities filed charges against all the defendants charging them with interstate transportation to commit these same murders which is a federal offense. [¶] Stewart Woodman entered into an agreement with the federal authorities in that case. He was allowed to plead guilty to the federal charges in exchange for his testimony against the remaining defendants in the federal court. [¶] All defendants were tried in federal court in 1991 and Stewart Woodman testified against them in those proceedings."

Defendant complains that the court erred in giving this statement because it implied he had been convicted of the federal charges. The Attorney General responds that defendant forfeited his claim regarding the statement because he failed to object on this ground. Defendant asserts no objection was necessary, citing language from section 1259: "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

We agree the claim is forfeited. Defendant's counsel not only failed to raise this concern when the trial court first proposed its statement, counsel remained silent even when the court itself raised the question of whether it should have included a specific directive to the jury not to concern itself with the results of the federal trial. Nor did counsel speak up when, just before Stewart Woodman testified, the trial court again solicited comments. Moreover, contrary to the position he takes now, defendant's trial counsel did not make a global objection to any statement regarding the federal trial when he sought a mistrial after Art Taylor inadvertently referred to his testimony at that trial. The two events were entirely unrelated, and counsel made no statement at the earlier proceedings, two months

85

before Stewart Woodman testified, that could in any way be construed as an objection to the court's later statement. Nor does section 1259 help defendant. That section applies to instructions, but the court's statement was not an instruction. (See Black's Law Dict. (9th ed. 2009) p. 935 [a jury instruction is "[a] direction or guideline that a judge gives a jury concerning the law of the case"].) The court's statement did not direct the jury on any legal point, it merely provided background information about a witness. As such, it was more in the nature of a stipulation drafted by the court and accepted by counsel.

Accordingly, defendant has forfeited any objection to the court's statement. Even had he not, we would reject his claim on the merits. Nothing in the statement suggested the outcome of the federal proceedings with respect to defendant. Defendant's claim that the instruction unmistakably implied to the jury he was convicted and thus "diminished [their] feelings of responsibility" is wholly speculative and without support in the record.

### J. Cumulative Prejudice from Guilt Phase Errors

Defendant contends that the cumulative prejudice arising from guilt phase errors requires reversal. "Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment." (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

## II. PENALTY PHASE ISSUES

### A. Limitations on Voir Dire

Defendant contends the trial court restricted voir dire on the subject of the Tipton murders, thus denying him an impartial penalty juror. His specific complaint involves the questioning of a single prospective juror, J.R., who was

excused via a peremptory challenge by the prosecutor, but he asserts the restriction the trial court placed on his voir dire of J.R. regarding the Tipton murders prevented him from asking any other prospective jurors about the subject of additional murders and their effect on whether they would vote for death.

J.R. wrote on his questionnaire that "the death penalty is justified for certain kinds of murder." The trial court questioned him about that response, stating, "I'm getting the impression from you that if you get [to the penalty phase] and you have a first-degree, premeditated, coldblooded killing, or two of them, that you think that that ought to be the death penalty." J.R. replied, "it would depend on the person's background, like if it is the first time he ever did anything wrong. Maybe life without possibility of parole would be sufficient." J.R. then volunteered, "But if it's continuous." The court asked a clarifying question: "A series of murders in the past would make a difference to you?" J.R. replied, "Right." The court pressed: "So if you heard that this person had not committed any crimes before, that is something you would take into consideration as a mitigating factor." Again, J.R. answered, "Right."[41]

Before he began his questioning of J.R., defendant's counsel sought a sidebar conference and expressed his concern that J.R., who had lived in Las Vegas during defendant's trial for the Tipton murders, may have heard about that trial. Because the Tipton murders would be introduced by the prosecution during the penalty phase, defendant's counsel asked the court to "follow up on that issue, also." The court asked J.R. whether he knew anything about the Tipton murder

---

[41]    In this case, pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1, prospective jurors were individually questioned outside the presence of other prospective jurors, first by the trial court and then by the parties, after which the court entertained challenges for cause.

trial or remembered seeing the names of any of the defendants in connection with that trial.  J.R. said he had not.

When it was his turn to voir dire J.R., defendant's counsel gave J.R. a hypothetical crime that closely tracked the facts of the Woodman murders and asked J.R. if he could conceive of voting for any punishment other than death. J.R. replied that he could consider voting for life without the possibility of parole. Defendant's counsel then asked, "If you were to add to that evidence you heard during the penalty phase, heard evidence about the person and heard evidence that convinced you that the same person had committed four other—."  The prosecutor objected that the question called for "[p]rejudging the evidence."  The objection was sustained.  Defendant's counsel asked, "You heard evidence in the penalty phase that convinced you that this person had committed a number—."  This drew the same objection.

At the bench, the prosecutor argued that the question defendant's counsel was attempting to ask—about the Tipton murders of which defendant had been convicted after the Woodman shootings—called for prejudging the evidence. Defendant's counsel replied, "What I'm trying to do is basically indicate the scenario where the aggravating circumstances are multiple murder . . . and if he could consider any other penalty . . . than death in that situation."  The court responded, "Well, the problem is that when we get to factors in aggravation and factors in mitigation, if you start listing the ones that are actually going to be presented in this case, I don't see how you can avoid asking a juror to prejudge the evidence and to tell you in advance how he's going to vote on that case."  The trial court sustained the objection.  The court pointed out, however, that based on J.R.'s answers to its questions, he had indicated that if a person had committed additional murders "that would weigh in favor of the death penalty for him and so you just make your call based on that."

Accordingly, when voir dire resumed, defendant's counsel asked J.R. whether "the one thing that would weigh on your mind and be a consideration against imposing the death penalty would be if the person had never previously committed this type of crime." J.R. responded, "Right."

Later, the court denied both defendant's and the prosecutor's challenges for cause to J.R. The prosecutor exercised a peremptory challenge to excuse J.R.

Defendant argues the trial court's voir dire ruling is akin to the one we deemed reversible error in *People v. Cash* (2002) 28 Cal.4th 703. "In *Cash*, the defendant was convicted of one count each of murder in the course of robbery and attempted murder. During the penalty phase, the prosecution presented evidence that the defendant killed his elderly grandparents when he was 17 years old. The jury returned a verdict of death. (*Id.* at pp. 714, 717.) On appeal, the defendant claimed the court erred by refusing to allow defense counsel to ask prospective jurors whether they would automatically vote for death if the defendant had previously committed another murder. During jury selection, the court had imposed a blanket rule restricting voir dire solely to the facts appearing on the face of the charging document. (*Id.* at p. 719.) We concluded that the court erred . . . for two reasons. First, a trial court cannot absolutely bar mention of any fact or circumstance solely because it is not expressly pleaded in the charging document. (*Id.* at p. 722.) Second, and relevant to the evidence in that particular case, a prior murder was 'a general fact or circumstance that . . . could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances . . . .' (*Id.* at p. 721.)" (*People v. Solomon* (2010) 49 Cal.4th 792, 839-840.)

Defendant contends that, as in *Cash*, the trial court erroneously issued a blanket prohibition against any mention of additional murders. Not so. In this case defense counsel did not seek to ask globally of all prospective jurors whether

89

the fact defendant had committed the Tipton murders in addition to the Woodman murders would affect their ability to consider both life without the possibility of parole and the death penalty. Thus, unlike *Cash*, "the trial court did not categorically prohibit inquiry into the effect on prospective jurors of the other murders," but "merely cautioned [defendant's] counsel not to recite specific evidence expected to come before the jury in order to induce the juror to commit to voting in a particular way." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 47.) J.R. himself did not sit on defendant's jury, eliminating any prejudice even were we to assume voir dire was improperly limited as to him. (*People v. Roldan* (2005) 35 Cal.4th 646, 692.)

Nonetheless, defendant asserts that the trial court's ruling as to J.R. prevented him from asking any other juror about the issue of additional murders. The specific circumstances surrounding the voir dire of J.R. on this point belie this claim. The question about the Tipton murders came up during J.R.'s voir dire because of a combination of circumstances that were particular to him—the fact that he had lived in Las Vegas during defendant's trial for those murders and his answers to the court's questions about the impact that other killings would have on his ability to consider both penalties.

Defendant fails to cite another instance where this issue arose in connection with the questioning of any other prospective jurors, that is, where defendant was prohibited from addressing the impact of the commission of multiple murders on a prospective juror's ability to consider both penalties. Rather, as the Attorney General points out, defendant was allowed to explore this general subject with other prospective jurors who raised concerns about whether they could consider life without the possibility of parole for serial killers or mass murderers. For example, defense counsel questioned a juror who had indicated on her questionnaire that life without the possibility of parole was not appropriate "for

90

serial killers and mass murderers" but might be "for some people who have made for some reason bad decisions once" in their lives. Counsel asked: "[A]re you saying that there are certain instances where you would not consider life without parole in deciding on a punishment for someone?" and whether the prospective juror was thinking about a particular case. The juror answered that she did not recall exactly the case that had inspired her answer but remembered it was "some serial killer who got life in prison and to me I thought that that was, for the taxpayers, to have to pay them for the rest of his life was wrong." Another prospective juror told the court that in the case of "a serial killer who has committed several crimes" it "would be probably best for all simply to sentence him to death." Defense counsel asked him whether his response indicated that there were situations where he would automatically impose the death penalty. The prospective juror said, "No, never." Defense counsel also asked two other jurors a question expressly prohibited in *Cash* about whether there were additional circumstances or facts that the prospective jurors would want to hear about before they could vote for life.

These exchanges illustrate that despite the court's ruling on Prospective Juror J.R., who did not serve on the jury, defense counsel was generally able to investigate whether prospective jurors harbored biases regarding multiple killings that might lead them to vote automatically for death. There is no reason to believe—and defendant fails to show anywhere in the record—that had any other prospective juror registered qualms about sentencing to life a defendant who had committed murders other than those charged, defendant would not have been allowed to generally inquire into that subject. His claim that defense counsel was chilled from introducing the subject himself in a general fashion by the trial court's ruling with respect to J.R. is speculation unsupported by the record.

91

Accordingly, we reject defendant's assertion that reversal is required based on the trial court's ruling with respect to the questioning of Prospective Juror J.R.

## B. Issues Related to Admission of Defendant's Convictions for the Tipton Murders Under Section 190.3, Factor (b)

As part of its presentation of the Tipton murders, the prosecution was allowed to introduce documentary evidence of defendant's convictions for the murders. Because the Tipton murders occurred after the Woodman murders, the record of defendant's convictions was admitted under section 190.3, factor (b) (other violent criminal activity) rather than factor (c) (prior felony conviction.)[42] Defendant contends the convictions were inadmissible hearsay for purposes of proving other violent criminal activity. He also contends the trial court erred by denying him a hearing to challenge the constitutional validity of the Tipton murder convictions based on ineffective assistance of Nevada counsel.

### 1. *Defendant's convictions as inadmissible hearsay for purposes of proving section 190.3, factor (b) and related claims*

Defendant claims the trial court erred when it denied his motion to exclude evidence of the Nevada convictions for purposes of proving factor (b) of section 190.3 because the convictions were hearsay and also more prejudicial than probative under Evidence Code section 352. He also claims the trial court committed instructional error with respect to the evidence of the convictions.

A prior felony conviction for a violent crime is "admissible under section 190.3, factor (b) as proof of criminal activity by" the defendant. (*People v. Hinton*

---

[42] Section 190.3, factor (b) permits the trier of fact, in determining the penalty, to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Factor (c) permits the trier of fact to consider "[t]he presence or absence of any prior felony conviction."

(2006) 37 Cal.4th 839, 910; *People v. Ochoa* (2001) 26 Cal.4th 398, 457 ["We have observed a prior felony conviction for a violent crime could fulfill both section 190.3 factors (b) (violent criminal activity) and (c) (prior felony conviction)."]; *People v. Ray* (1996) 13 Cal.4th 313, 369 (conc. opn. of George, C. J.) ["[T]he prosecution may rely upon a prior *conviction* of a crime involving the use or threat of force or violence to establish the presence of criminal activity involving the use or threat of force or violence for purposes of section 190.3, factor (b)."].)  Therefore, the trial court did not err by admitting the Nevada convictions as evidence in support of factor (b).[43]

Defendant also contends the Nevada convictions should have been excluded as more prejudicial than probative under Evidence Code section 352.  He asserts the convictions had little or no probative value "because the jury had no conceivable way to determine the appropriate weight that should be attached to the evidence."  The test for relevance is not how the trier of fact weighs a particular piece of evidence but whether the evidence has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The Nevada convictions were unassailably probative of defendant's participation in the violent criminal activity underlying the convictions.

As for prejudice, "[e]vidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party

---

[43]     The principle was first advanced in Chief Justice George's concurring opinion in *Ray*, in which a majority of the court concurred.  (*People v. Ray*, *supra*, 13 Cal.4th at p. 369 (conc. opn. of George, C. J.).)  Defendant goes on at some length questioning the validity of the analysis and conclusion of that opinion.  We are unconvinced by his arguments and decline to overrule *Ray* or its progeny.

as an individual" ' [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors" ' [citation]." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 475.)  The prosecution called numerous witnesses to prove defendant murdered Bobbie Jean Tipton, her maid Marie Bullock, and James Myers, a delivery man who had the misfortune of being at the Tipton residence when defendant arrived.  That evidence tended to show the callous and mercenary nature of the crimes.  For example, Timothy Catt testified that defendant told him, about Bobbie Jean Tipton, "I shot her in the head.  I offed her in the head.  I dusted her.  Wasted her."  Catt and other witnesses testified that defendant was motivated by the desire to steal Tipton's jewelry.  Given the quantity and type of evidence the jury heard, we are not persuaded that the cold record of defendant's convictions was likely to evoke the unique species of bias against him that is the concern of Evidence Code section 352 or to lead the jury to convict him based on extraneous factors.

Defendant next contends the trial court erred by failing to sua sponte instruct the jury regarding the weight to be given to the evidence of his convictions.  The trial court was under no sua sponte duty to give a special instruction telling the jury what weight should be given to a single piece of evidence.  Indeed, such an instruction might have been an improper pinpoint instruction.  "A trial court must instruct on the *law* applicable to the facts of the case.  [Citation.]  In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense.  [Citation.]  The court must, however, refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

Moreover, the premise of defendant's argument—that unless instructed the jury may have found the convictions dispositive—is entirely speculative.  The jury

94

was instructed that, before it could consider the Tipton murders as a factor in aggravation, it must find beyond a reasonable doubt that defendant committed the crimes. The prosecution presented a panoply of witnesses on this point, and in the prosecutor's extensive review of the evidence during his closing argument, he mentioned the Nevada convictions only twice and in passing. Thus, no particular emphasis was given to this evidence and nothing in the record suggests the jury gave dispositive or even significant weight to the record of defendant's convictions as opposed to the underlying conduct.

Finally, defendant contends the trial court erred when it rejected his proposed instruction that lack of a prior felony conviction was a mitigating factor, and that defendant had no such convictions. Instead, the trial court modified the standard instruction, CALJIC No. 8.85, to address the absence of any prior convictions: "You shall consider, take into account, and be guided by the following factors, if applicable: [¶] . . . [¶] C. The absence of any prior felony conviction, other than the crimes for which defendant has been tried in the present proceedings." In closing arguments, both the prosecutor and defense counsel noted that the absence of any prior convictions was a factor in mitigation. The trial court's instruction was correct. It did not err by denying defendant's special instruction. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [court need not instruct which of the section 190.3 factors could be aggravating and which only mitigating: "The aggravating or mitigating nature of the factors is self-evident within the context of each case."].)

### 2. *Denial of defendant's ineffective assistance of counsel challenge to the constitutionality of the Tipton convictions*

Just before the penalty phase trial began, defense counsel requested a continuance of about a week for a hearing on whether his Nevada counsel rendered ineffective assistance in the Tipton murders trial. The court denied the

request but agreed to consider a written motion based on the Nevada trial transcripts. After further discussion of the delays this would entail, defense counsel offered to submit a declaration setting forth the grounds for the ineffective assistance claims to be filed under seal. He explained: "The reason I am doing it that way is if the court feels I have not made a prima facie showing, that should be the end of it. If the court feels, based on a prima facie showing we are entitled to a hearing that would be an adversarial hearing." The court agreed: "As a threshold issue, I will look at it in camera, and if it appears to be something the People need to address, then—all right."

The following day the trial court ruled on the motion to exclude the Nevada convictions based on defendant's claim of ineffective assistance. "I read the opinion of the Nevada Supreme Court. I read [defense counsel's] declaration and I read some portions of the more detailed factual summary contained in the appellant's opening brief. [¶] I have considered all that and the motion is denied." There was no further discussion of the issue at that point.

During the prosecution's case, defense counsel requested permission to call expert witnesses to testify about Nevada counsel's representation of defendant. The court denied the request based on its earlier finding that defendant had failed to present a " threshold basis for questioning the competence of [Nevada] counsel."

The issue surfaced one last time in defendant's new trial motion. Defendant asserted: "The trial court erred when it refused to allow the defense to present evidence to the jury that the Tipton convictions were obtained in violation of defendant's fundamental constitutional right to due process and effective assistance of counsel."

In denying the new trial motion on this ground, the court stated: "[A]ll the cases cited by the defendant in support of the court's duty to inquire into the

96

constitutional validity of a prior . . . are cases where the defendant's prior was based on a guilty plea, the validity of which raises legal issues for the court. [¶] Here the validity of the conviction which was suffered following a jury trial was explored during the penalty phase when all the evidence surrounding the convictions was offered to the jury. [¶] The conviction admitted had been affirmed by the Nevada Supreme Court. This court declined an invitation to revisit the issues that had been resolved by the Nevada Supreme Court and the defendant's motion for a new trial is denied."

Defendant asserts he was entitled to an evidentiary hearing on his challenge to the constitutionality of the Nevada convictions based on a claim of ineffective assistance of counsel. For this proposition he relies on *People v. Coffey* (1967) 67 Cal.2d 204, *People v. Sumstine* (1984) 36 Cal.3d 909, *Curl v. Superior Court* (1990) 51 Cal.3d 1292, and *People v. Horton* (1995) 11 Cal.4th 106. *Coffey* and *Sumstine* "establish the procedures for raising a collateral attack on a prior conviction by a defendant whose sentence is subject to enhancement because of the prior conviction." (*Horton*, at p. 1129.) In *Curl* and *Horton*, we held that those procedures were applicable in a capital case to challenge the constitutional validity of a prior murder conviction alleged as a prior-murder special circumstance. (*Curl*, at p. 1296; *Horton*, at pp. 1139-1140.)

The Attorney General contends that the right to challenge the constitutionality of a prior conviction does not include a claim of ineffective assistance of counsel. He relies on *Garcia v. Superior Court* (1997) 14 Cal.4th 953, a noncapital case in which we so held. We explained: "Compelling a trial court in a current prosecution to adjudicate this type of challenge to a prior conviction generally would require the court to review the entirety of the record of the earlier criminal proceedings, as well as matters outside the record, imposing an

97

intolerable burden upon the orderly administration of the criminal justice system." (*Garcia*, at p. 956.)

We need not decide whether *Garcia* applies to capital cases for two reasons. First, the trial court in this case *did* entertain defendant's ineffective assistance challenge to the constitutionality of the Nevada convictions, and it concluded his failure to make out a prima facie case obviated the need for further hearing. Defense counsel not only acquiesced in this procedure, he suggested it. The procedure was also consistent with case law: "[W]hen a defendant seeks to collaterally attack the validity of a prior conviction underlying a prior-murder special circumstance, he must first allege facts *sufficient to justify a hearing on his motion to strike the special circumstance*—i.e., 'allege actual denial of his constitutional rights.' (*People v. Sumstine*, *supra*, 36 Cal.3d at p. 922.) The court shall *thereupon* conduct an evidentiary hearing in the manner set forth in *Coffey* and *Sumstine*." (*Curl v. Superior Court*, *supra*, 51 Cal.3d at p. 1306, italics added; see *People v. Coffey*, *supra*, 67 Cal.2d at p. 215 ["the issue must be raised by means of allegations which, if true, would render the prior conviction devoid of constitutional support."].) Defendant having, in the trial court's view, failed to make this threshold showing, was not entitled to an evidentiary hearing.[44]

---

[44] Defendant disputes the trial court's finding that he failed to make out a prima facie case of ineffective assistance of counsel. A claim of ineffective assistances requires the defendant to establish "(1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1126.)

Defendant's ineffective assistance claim asserted that Nevada counsel failed to call certain witnesses, either through negligence or because Nevada

*(footnote continued on next page)*

Second, the validity of the prior convictions in this case involved an evidentiary issue—whether defendant had engaged in prior violent activity—not its validity as a sentence enhancement or a special circumstance. Therefore, even were we to assume the Nevada convictions were admitted in error, the error would be prejudicial only if it resulted in a "miscarriage of justice." (Evid. Code, § 353.) Here, any error was harmless. As we have observed, the documentary evidence of the convictions was neither the most important nor the most compelling part of the prosecution's section 190.3, factor (b) evidence, as demonstrated, for example, by the prosecutor's brief reference to it. Even had the court excluded that evidence, it is not reasonably possible defendant would have obtained a more favorable result at the penalty phase. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 703.)

The issue next arose when defendant sought to present expert testimony regarding Nevada counsel's alleged ineffective assistance. Preliminarily, defendant fails to present any support for the proposition that, where the

---

*(footnote continued from previous page)*

prosecutors failed to provide counsel with information about those witnesses. Two of those witnesses—Art Taylor and FBI Agent Livingston—assertedly would have supported defendant's alibi defense regarding his whereabouts at the time of the Tipton murders. As defendant concedes, however, the Nevada jury heard other testimony on this issue.

The testimony of two other witnesses—Raymond Jackson and James Hampton—would have gone to third party culpability. As the prosecutor pointed out, however, there was already such evidence in the record. A third witness, Manuel Corriera, would have testified that Michael Dominguez told the witness that he—Dominguez—and another man, Danielson, and not defendant, committed the Tipton murders. As defense counsel acknowledged, Nevada counsel was unaware of Corriera at the time of defendant's trial. The trial court concluded that defendant had not made a prima facie case of ineffective assistance or, if he had, he had failed to show prejudice. Based on our review of the equivocal, cumulative, and weak nature of the evidence, we cannot say the trial court erred.

99

constitutionality of a prior conviction is challenged, defendant is entitled to have the jury determine the challenge. Rather, as he acknowledges, such challenges are ordinarily determined by the trial court. (*Curl v. Superior Court*, *supra*, 51 Cal.3d at pp. 1301-1302.)

In any event, defendant was able to put before the jury the issue of whether he had been fairly convicted in Nevada. The defense called every witness it asserted had not been called during the Nevada trial, including Raymond Jackson, James Hampton, Manuel Correira, Art Taylor, and FBI Agent Livingston. In closing argument, defense counsel pointed out that Nevada counsel had not called these witnesses. He argued that Nevada counsel's omission constituted inadequate representation, declaring that defendant had been "wrongly convicted" and the Nevada trial was "a travesty of justice." Defendant fails to demonstrate he suffered any prejudice because the trial court declined to allow him to call a lawyer expert, whose testimony would undoubtedly have been controverted by prosecution experts, on the issue of ineffective assistance. (Evid. Code, § 354; see *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 ["[E]xcluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense."].)

Finally, defendant contends the trial court erroneously denied his new trial motion on the ground he had been denied a hearing on the constitutionality of the Nevada convictions. He argues the trial court improperly relied on the circumstance that those convictions had been affirmed by the Nevada Supreme Court, apparently suggesting that the trial court failed to exercise its discretion in ruling on the motion.

"On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes 'a "manifest and unmistakable abuse of

100

discretion." ' " (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27.)  While the trial court did refer to the Nevada Supreme Court's affirmance of defendant's convictions for the Tipton murders, the court also noted, "[T]he validity of the conviction which was suffered following a jury trial was explored during the penalty phase when all the evidence surrounding the convictions was offered to the jury."  From this remark, it appears the trial court believed defendant had been given an opportunity to present the claim he had been unjustly convicted in Nevada because of the inadequate representation by his lawyers who failed to call critical witnesses, and a new trial was not justified on this ground.  We find no abuse of discretion.

### C. Instruction on Mitigation Factors

Defendant contends the trial court's instruction regarding mitigating factors erroneously imposed a burden of proof on the defense.  Not so.  The trial court instructed the jury with a modified version of CALJIC No. 8.87.  The first five paragraphs of the instruction referred to evidence of the Tipton murders.  The third paragraph stated:  "Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts."  This was followed by:  "A juror may not consider any evidence of any other criminal acts or activity as an aggravating circumstance.  [¶] It is not necessary for all jurors to agree.  If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a factor in aggravation. If the juror is not so convinced, that juror must not consider the evidence for that purpose."  The final paragraph applied the principle that unanimity was not required for circumstances in aggravation to circumstances in mitigation as well: "Likewise, it is not necessary for all jurors to agree as to the existence of any

101

factor in mitigation. If any juror is *convinced* that such factor exists, that juror may consider that factor in mitigation in determining the appropriate punishment." (Italics added.)

Defendant contends the use of the word "convinced" in the latter instruction could have been understood by the jurors as requiring the defense to prove the mitigating factor. He asserts further that the juxtaposition of this paragraph with earlier paragraphs referring to the prosecution's burden of proving beyond a reasonable doubt that defendant committed the Tipton murders could have led jurors to believe the same standard applied to proof of factors in mitigation. Defendant had offered a special instruction that would have stated a mitigating circumstance need not be proved beyond a reasonable doubt; the trial court rejected it.

The inclusion of the burden of proof language in the paragraph discussing the factor in aggravation, juxtaposed against its omission in the paragraph discussing mitigation factors, clearly implied that the burden of proof applied only to the former, not the latter. Moreover, it is also clear that the purpose of the last paragraph, fairly read, was to inform jurors that, just as they need not unanimously agree on factors in aggravation, they need not unanimously agree on factors in mitigation. Defendant's reading of the instruction is strained, "and no reasonable juror would so interpret the instruction." (*People v. Wharton* (1991) 53 Cal.3d 522, 574.) Finally, defendant was not entitled to his proposed instruction. (*People v. Kraft* (2000) 23 Cal.4th 978, 1077.)

## D. Removal of a Juror During Deliberations

Defendant contends the trial court improperly dismissed a juror during penalty deliberations after the court determined she was incapable of performing her duties as a juror in a capital case based on a note she sent to the court.

102

Defendant also argues the replacement of the juror resulted in a coerced penalty verdict and diminished the jury's sense of responsibility for the verdict. Lastly, defendant contends the trial court erred when it denied his new trial motion based on the removal of the juror.

Penalty phase deliberations began on June 2, 1993. On June 4, the jury foreman sent the court a note indicating the jury was deadlocked. The jurors were brought into the courtroom where the foreman gave the court the numerical breakdown of the five ballots that had been taken to that point; from an initial vote of seven to five, to a final vote of 11 to one. After some further discussion, the court instructed the jury to resume deliberations.

Later that day, the trial court received a note from Juror No. 8. The note stated: "When I was questioned about the Death Penalty at the very beginning of this trial I stated that I believed that I could vote for the Death Penalty under special circumstances. I believe that the Death Penalty should be imposed if: (1) a child is involved [¶] (2) torture of an adult [¶] rape of an adult. [¶] Since none of these factors were involved I cannot vote for the Death Penalty for Steven Homick. That is the reason for the deadlock."

Concerned that the note was inconsistent with answers the juror had given during voir dire, the court, over defendant's objection, called her into the courtroom. The court explained to the juror that, having read her note, it wished to asked her some questions "to get a better understanding of what your position is," because her voir dire responses "seem to me, different from what you have written in this note."

The court reminded the juror that, when asked a hypothetical question by defense counsel containing the circumstances surrounding the Woodman murders, she had said she could consider both the death penalty and life without the possibility of parole in such a case. The court read her a question posed by the

103

prosecutor who, after telling the juror there were no children involved in the case, asked, "[D]o you feel you still could think about the death penalty in a case where there were no children as victims, but adult victims?" The court read her answer: "Yes." The court read the prosecutor's followup question and the juror's response: "So in your mind the death penalty would be appropriate even in cases where children were not involved, is that right? [¶] And you said, oh, yes."

The court then read back the juror's note and asked whether her voir dire responses and the note "seem the same to you?" The juror replied: "Yes they seem the same to me. I have also had 9 months to think about it, too. I think that had a lot to with it. [¶] When [the prosecutor] asked me about that, I answered yes, I thought I could, and I did. I thought about it, and I thought, one of the instructions was that if I didn't feel that the crime was bad enough to merit the death penalty then I could vote for life imprisonment." The court responded, "Absolutely."

The juror continued, evidently referring to her fellow jurors, "Apparently they feel that I either did not understand the questions in the beginning—but I told them I said, they asked me about children, and I said if a child was involved, I thought the death penalty could be incurred; and if—what I guess I didn't say, if there was—whether torture or rape was involved. I guess I never mentioned that . . . . [¶] . . . [¶] So I could still find the death penalty, as far as an adult is concerned . . . if an adult was tortured, if an adult was raped, I could find the death sentence for that. But—and it's not just this factor, Your Honor. There are several other factors involved."

The court said, "You don't need to explain. I am not asking you to explain or justify your position. . . . [¶] My concern was simply this note seemed to say, I have always said I could only do it in a case, for example with a child, or rape, or torture. And that seemed different from what you had said at the beginning." The

104

juror responded, "I don't feel that it is." The court asked her whether, when she said she could consider the death penalty in response to defense counsel's hypothetical, "that was true?" The juror said, "Yes." The court continued: "You could consider it, but you concluded that that's not how you want to vote, but when you said before you could consider, that was a true statement?" The juror replied, "Yes."

At sidebar, defense counsel took the position that "what this juror is saying is, in this case I don't believe the crime is such that I want to impose death." The court indicated it was inclined to agree with defense counsel, but recessed for the weekend without ruling. After the recess, the prosecutor sought the juror's removal, arguing her note established she was substantially impaired from performing her duties under *Wainwright v. Witt* (1985) 469 U.S. 412.

Ultimately, the court agreed with the prosecutor: "My attention continues to return to the note written by [Juror No. 8]. This note is clear, it's specific and it's unambiguous, unlike her answers to the court's questions on Friday afternoon. [¶] I believe the sequence of events is she wrote this note, which clearly reflects her views, and then she heard her voir dire answers, which I read to her on Friday, then she attempted to reconcile the [two]. [¶] And my continuing difficulty with the language of her note is based on the fact that it does appear to expressly state that she cannot fairly deliberate on the issue of penalty in this case, because she has a specific agenda. And that agenda, had she expressed it to the court and the attorneys during the initial voir dire, would have disqualified her from service in this trial. [¶] The law supports the position of the district attorney that it is irrelevant that she is saying it now, rather than then. The effect is the same. She is not qualified to sit as a juror in a capital case."

The court continued: "The greatest difficulty imposed by the facts of this case arises from the court's knowledge of the numerical division of this jury's

105

vote," observing, "had I been unaware of the jury's numerical division, I would not have hesitated. I would have simply removed this juror and found she was impaired under Witt versus Wainwright without hesitation." On that ground, the juror was excused. Defendant moved for a mistrial, which the court denied. The court also denied the defense request to pose two further questions to the juror.[45]

After the juror was excused, the court instructed the remaining jurors: "Juror Number 8 has been removed from the jury by the court, and an alternate substituted. She was removed because of the contents of the note she wrote to the court in which she made it clear that she could not follow the court's instruction with respect to considering both possible penalties in this case. [¶] It is important that you understand that she was not removed from this jury because of her refusal to vote for the death penalty, but because of her refusal to consider the death penalty in the type of case under consideration." After an alternate was seated, the court further instructed the jury to disregard its previous deliberations and begin anew. The following day the jury reached a verdict.

In his new trial motion, defendant argued as one ground for granting the motion the removal of Juror No. 8, who submitted a declaration in support of the motion. In her declaration she stated: "In no way was I saying in the note nor in court that I believed I could only vote for the death penalty in a case involving rape, torture, or a child," and provided other reasons she would not have imposed

---

[45] The first question would have asked: "On Friday, you said that if an adult was tortured or raped you could vote for the death sentence. You said that was one factor, and there were several other factors involved. What were these several other factors?" The second would have asked, "Are you saying that the only time you could vote for death on an adult is if he was tortured or raped?"

the death penalty that she would have shared with the court, had she been allowed to do so. The motion was denied.

"The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. (§ 1089.) 'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]' [Citation.] . . . 'Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. [Citations.]' [Citation.] [¶] 'A sitting juror's actual bias, which would have supported a challenge for cause, renders him "unable to perform his duty" and thus subject to discharge and substitution . . . .' [Citation.] Specifically, in the death penalty context, we have explained that '[a] juror may be disqualified for bias, and thus discharged, from a capital case if his views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " [Citations.]' " (*People v. Lomax* (2010) 49 Cal.4th 530, 588-589.)

While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. "The demonstrable reality test entails a more comprehensive and less deferential review" than substantial evidence review. "It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on

107

which the court actually relied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053.)

Defendant argues the juror's removal was improper because there was no indication from other jurors that she was unwilling to deliberate. That argument misapprehends the basis on which the trial court removed the juror, which was not because she refused to deliberate, but because her views on capital punishment prevented or substantially impaired her ability to perform her duties. (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424.) Here, Juror No. 8's note explaining the jury's impasse explicitly stated that she could apply the death penalty in only three circumstances—a child victim or an adult victim who had been raped or tortured. Since "none of these factors were involved [in this case] I *cannot* vote for the Death Penalty for [defendant]." (Italics added.) As the court observed, the note was "clear . . . specific and . . . unambiguous," and the views she expressed in it, had they been revealed during voir dire, "would have disqualified her from service in this trial."

Defendant contends the juror's responses in her original voir dire examination and to the court's questioning during the penalty phase "made clear she could consider death" in the present case. Defendant also points out the trial court did not find the juror was being untruthful. Fairly considered, however, the record supports the trial court's conclusion that the note reflected the juror's actual views, which she struggled to reconcile with her voir dire responses only after being confronted with them. The views she expressed in her note were patently inconsistent with those she gave in response to voir dire. On voir dire she said she could consider both penalties in a hypothetical case identical to the case before her, but her note explicitly stated that, because there were no child victims or adult victims who had been raped or tortured, "I *cannot* vote for the Death Penalty for [defendant]." (Italics added.)

108

Moreover, even while maintaining her earlier voir dire responses were compatible with her note, the juror's responses to the court actually reinforced the sentiments she had expressed in the note. When she was discussing her difficulties with her fellow jurors, who apparently felt she had misunderstood the questions asked of her on voir dire, she said she told them: ". . . I said, they asked me about children, and I said if a child was involved, I thought the death penalty could be incurred . . . what I guess I didn't say . . . was . . . whether torture or rape was involved . . . . [¶] . . . [¶] So I could still find the death penalty, as far as an adult is concerned . . . if an adult was tortured, if an adult was raped, I could find the death sentence for that." Her explanation suggests Juror No. 8 told her fellow jurors that in her recollection of voir dire she had said she could impose the death penalty only if a child victim was involved. Her further comment implied she had either failed on voir dire or failed to tell her fellow jurors about the only other two categories where she could apply the death penalty. This statement is consistent with the position she took in her note.

Defendant seizes upon the juror's further statement—"But . . . it's not just this factor, Your Honor. There are several other factors involved." He claims the court erroneously cut her off before she could discuss those "other factors," which would have revealed that her refusal to vote for the death penalty was based on her evaluation of the evidence presented at the penalty phase. But the juror had already said she would not vote for death in this case because it did not involve a child victim or adult victims who had been raped or tortured. That she could have cited other reasons does not change the fact that her refusal was also categorical. The court did not err by refusing either to delve into those other reasons or

109

permitting defense counsel to do so when he sought to ask her additional questions.[46]

In this connection, we also reject defendant's claim that the trial court abused its discretion when it denied his new trial motion on the ground the juror was improperly removed. Defendant claims that the basis of the court's ruling was its erroneous conclusion that the declaration, which detailed Juror No. 8's reasons for not voting for the death penalty, constituted deliberative processes which the court declined to invade. The crux of the juror's declaration, however, was her attempted disavowal of her note ("In no way was I saying in the note nor in court that I believed I could only vote for the death penalty in a case involving rape, torture, or a child"). Implicit in its denial of the motion was the court's rejection of this statement as not credible. We find no abuse of discretion in the denial of the motion on this ground. (*People v. Hoyos*, *supra*, 41 Cal.4th at p. 917, fn. 27.)

Next, defendant contends the trial court's replacement of Juror No. 8, knowing the numerical breakdown had been 11 to one in favor of the death penalty, coerced a death verdict. For this proposition, he cites *Brasfield v. United States* (1926) 272 U.S. 448. In *Brasfield*, the United States Supreme Court held it

---

[46] Defendant asserts the trial court's ruling was inconsistent with its finding that the juror was not lying and that its ultimate ruling contradicted the comments it had made after questioning the juror three days earlier. This misreads the record. The fact the juror may have sincerely believed that her note was consistent with her voir dire answers does not make it so. Further, the trial court in no way tentatively ruled in defendant's favor after questioning the juror; rather, the court specifically reserved making a ruling until the following Monday. Thus, there is no inconsistency between the court's remarks after questioning the juror and its ultimate ruling, which it made after conducting its own research, considering the prosecutor's points and authorities, and reflecting further on the matter.

was reversible error for a trial court, faced with a deadlocked jury, to inquire into its numerical division because "in general [the] tendency [of such inquiry] is coercive." (*Id.* at p. 450.)

As defendant concedes, California does not follow the *Brasfield* rule. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1254 [declining to follow *Brasfield* and noting "our many decisions allowing inquiry into a jury's numerical split"].) Nonetheless, defendant contends replacing Juror No. 8 under the circumstances of this case did have a coercive effect on the jury.

We reject his claim. As defendant concedes, the foreman volunteered the jury's numerical split without inquiry or prompting by the trial court. Once Juror No. 8 was dismissed, the trial court specifically instructed the remaining jurors that her removal was due to her inability to follow the court's instruction to consider both possible penalties and not "because of her refusal to vote for the death penalty." The court also instructed the reconstituted jury that it was to disregard its previous deliberations and begin anew. We must presume the jurors followed the court's instructions. (*People v. Johnson*, *supra*, 3 Cal.4th at p. 1254.)

Finally, defendant contends the trial court's removal of Juror No. 8 communicated to the remaining jurors the court's belief that the death penalty was appropriate in this case, thus diminishing the jury's sense of responsibility for its verdict. For this proposition, defendant relies on *Caldwell v. Mississippi* (1985) 472 U.S. 320.

In *Caldwell*, "a plurality of the Supreme Court held 'it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' [Citation.] [¶] Subsequently, however, the Supreme Court has recognized that *Caldwell*'s holding may be narrower . . . . '. . . Thus, "[t]o establish a *Caldwell* violation, a

111

defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." ' [Citations.]" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 592.) "*Caldwell* error occurs when the jury has been 'affirmatively misled . . . regarding its role in the sentencing process so as to diminish its sense of responsibility.' " (*People v. Osband* (1996) 13 Cal.4th 622, 694.)

Here, the trial court said nothing to the jury that could be interpreted as communicating its views about the penalty issue so as to lessen the jury's sense of responsibility for the verdict. To the contrary, the trial court's instruction to the reconstituted jury before sending it out to resume deliberations contained the following admonitions: "I have not intended by anything I have said or done, or by any ruling I have made, to intimate or suggest to you what you should believe to be the facts, that I believe or disbelieve any witness, or that you should reach a particular verdict. [¶] If anything I have said or done seems to so indicate, you will disregard it and form your own conclusions." We must presume the jury heard, understood, and followed this instruction. (*People v. Avila*, *supra*, 38 Cal.4th at p. 575.)

### E. Challenges to the Death Penalty Statute Based on Constitutional Considerations and International Law

Defendant advances a number of challenges to the death penalty statute and its use based on constitutional provisions and international law. We have repeatedly rejected these claims and do so again.

We again therefore conclude that:

(1) "[T]he statute is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination, other than other crimes evidence, and specifically that all

112

aggravating factors must be proved beyond a reasonable doubt, or that such factors must outweigh factors in mitigation beyond a reasonable doubt, or that death must be found to be an appropriate penalty beyond a reasonable doubt [citation] . . . ." (*People v. Panah*, *supra*, 35 Cal.4th at p. 499.)  "Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey*[ (2000)] 530 U.S. 466, or *Ring v. Arizona*, *supra*, 536 U.S. 584, affects our conclusions in these regards."  (*People v. Loker* (2008) 44 Cal.4th 691, 755.)

(2)  "The failure of the court's instruction to require specific written findings by the jury with regard to the aggravating factors found and considered in returning a death sentence did not violate defendant's constitutional rights to meaningful appellate review and equal protection of the law."  (*People v. Parson* (2008) 44 Cal.4th 332, 370.)

(3)  " 'California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty . . . .' [Citation.]"  (*People v. Riggs*, *supra*, 44 Cal.4th at p. 329.)

(4)  "The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution."  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 227.)  "We do provide *intracase* proportionality review.  Defendant does not specifically request such review, but given the crime . . . , it is inconceivable that it would aid him."  (*People v. Valencia* (2008) 43 Cal.4th 268, 310-311, parentheses omitted.)

(5)  The jury was not instructed with section 190.3, factors (d) (the crime was committed "under the influence of extreme mental or emotional disturbance") or (g) ("defendant acted under extreme duress or under the substantial domination of another person") and, therefore, defendant has no standing to complain about the use of the words "extreme" and "substantial" in those factors.  In any event,

113

we have previously rejected such challenges.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 516.)

(6)  "[T]he phrase 'whether or not' in section 190.3, factors (d) through (h) and (j)" does not allow "the absence of a mitigating factor to be considered as an aggravating circumstance . . . ."  (*People v. Page* (2008) 44 Cal.4th 1, 61.)

(7)  "Defendant argues that the death penalty in California violates the California Constitution and the Eighth and Fourteenth Amendments to the United States Constitution because it is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted.  [¶] We have repeatedly rejected substantially similar claims, concluding over 20 years ago that 'prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not . . . offend principles of equal protection, due process, or cruel and/or unusual punishment.'  [Citations.]  [¶] Defendant, however, urges this court to reexamine our decisions in prior cases in light of the United States Supreme Court's voting rights decision in *Bush v. Gore* (2000) 531 U.S. 98 [148 L.Ed.2d 388, 121 S.Ct. 525], which, he asserts, requires uniformity among California's 58 counties for prosecutorial standards for seeking the death penalty.  But as the high court explained, its consideration of the equal protection challenge to Florida's voting recount process was 'limited to the present circumstances, for the problem of equal protection in *election processes* generally presents many complexities.' (*Id.* at p. 109, italics added.)  That case, therefore, does not warrant our revisiting our prior holdings on the instant issue.  [Citation.]"  (*People v. Vines*  (2011) 51 Cal.4th 830, 889-890.)

(8)  Defendant contends the delay in processing his appeal violates the Eighth and Fourteenth Amendments to the United States Constitution.  Not so. "One under judgment of death does not suffer cruel and unusual punishment by the inherent delays in resolving his appeal.  If the appeal results in reversal of the

death judgment, he has suffered no conceivable prejudice, while, if the judgment is affirmed, the delay has prolonged his life." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 677; see *People v. Panah*, *supra*, 35 Cal.4th at p. 500.)

(9) "The sentencing guidelines set forth in section 190.3 sufficiently narrow the class of homicide offenders who are eligible for the death penalty. [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 648.)

(10) The death penalty statute is not deficient because it does not require that the jury be instructed on the presumption of life, nor was there any error because the jury was not so instructed. (*People v. Young* (2005) 34 Cal.4th 1149, 1233.)

(11) "We similarly reject defendant's claims that the state and federal Constitutions are violated by the alleged influence of political pressure on this court in determining capital appeals. There is no basis for this claim and we have previously rejected it." (*People v. Samuels* (2005) 36 Cal.4th 96, 138.)

(12) Defendant contends that violations of his constitutional rights also violate international law. However, as the predicate for his claim—that his constitutional rights were violated—is erroneous, so too, then, is the conclusion he draws regarding international law. To the extent he challenges the death penalty itself as violative of international norms, we again reject this claim as we have done repeatedly and consistently in other cases. (*People v. Hartsch*, *supra*, 49 Cal.4th at p. 516; *People v. Panah*, *supra*, 35 Cal.4th at pp. 500-501.)

(13) Since we have rejected these individual challenges raised above, there is no cumulative effect of deficiencies in the statute or its operation that requires our further review.

### F. Cumulative Impact of Guilt and Penalty Phase Error

Defendant contends that any guilt phase errors must be assessed in terms of their prejudicial effect at the penalty phase and any penalty phase errors must be deemed substantial. We have found either no error or, assuming error, no prejudice, either individually or in the aggregate for purposes of the guilt phase. We conclude further that neither individually nor in the aggregate were they prejudicial to defendant at the penalty phase.

### DISPOSITION

The judgment is affirmed.

WERDEGAR, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**DISSENTING OPINION BY KENNARD, J.**

Following a bizarre plot hatched in Las Vegas, Nevada, defendant and five others (two of them sons of the victims) carried out the September 1985 murders of Vera and Gerald Woodman in Los Angeles, California. In a federal prosecution against defendant based on these killings, a jury in January 1991 convicted him of murder for hire, for which he was sentenced to life imprisonment.[1] Thereafter, in October 1991, defendant unsuccessfully requested the Los Angeles County Superior Court to dismiss the murder charges then pending against him in this case. Defendant asserted that California Penal Code section 656's prohibition against double jeopardy precluded the California prosecution because it was founded upon the same act (the Woodman murders) that was the basis of his earlier conviction in federal court. (Further undesignated statutory references are to the Penal Code.)

The majority upholds the trial court's rejection of defendant's claim, and it affirms defendant's capital murder convictions. I disagree and would reverse the trial court's judgment.

In the section that follows, I briefly discuss the double jeopardy clause of the Fifth Amendment to the United States Constitution and then California's statutory double jeopardy provision, which affords greater protection than that

---

[1] The federal law's murder-for-hire statute under which defendant was convicted imposes life imprisonment when a defendant "travels . . . in interstate . . . commerce . . . with intent that a murder be committed in violation of the laws of any State . . . as consideration for the receipt of . . . anything of pecuniary value . . . and if death results." (18 U.S.C. former § 1952A.)

1

contained in the Fifth Amendment.  Thereafter, in part II, I apply the California statute to this case.

## I

The federal Constitution's Fifth Amendment, adopted in 1791, prohibits placing a criminal defendant "twice . . . in jeopardy" for the same crime.  (U.S. Const., 5th Amend.)  This clause " ' "protects against a second prosecution for the same offense after acquittal" ' " as well as " ' "after conviction." ' "  (*Ohio v. Johnson* (1984) 467 U.S. 493, 498.)  As the high court has explained, the bar against double jeopardy seeks to ensure that the government "does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of," among other things, "an impermissibly enhanced sentence."  (*Id*. at pp. 498-499.)  But federal law does not preclude successive prosecutions for the same criminal conduct when brought by this nation's separate sovereigns, namely, the United States government and a state's government.  (*Abbate v. United States* (1959) 359 U.S. 187, 194-195; *Bartkus v. Illinois* (1959) 359 U.S. 121, 136; see *Department of Revenue of Montana v. Kurth Ranch* (1994) 511 U.S. 767, 782, fn. 22 [the federal Constitution "does not prohibit successive prosecutions by different sovereigns"].)  Any state is free, however, to craft its own law expanding double jeopardy protections beyond those afforded by the federal Constitution.  (*People v. Comingore* (1977) 20 Cal.3d 142, 145 (*Comingore*); *People v. Belcher* (1974) 11 Cal.3d 91, 97 (*Belcher*).)  California did so in 1872 by a legislative enactment that precludes successive prosecutions by different sovereigns, and that is still the law today.

The California statute at issue, section 656, provides:  "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, [or] another state . . . based upon an act or omission in

2

respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense." On point here are two decisions by this court.

In *Belcher*, this court held in 1974 that after a federal court acquittal for assaulting a federal officer in California, the State of California's prosecution of the defendant for the same assault on the same person violated section 656's double jeopardy prohibition. (*Belcher*, *supra*, 11 Cal.3d at p. 99.) And three years later, in *Comingore*, this court held that a "joyriding" conviction in the State of Oregon based on the defendant's unlawful taking of a car in California and driving it to Oregon barred California from thereafter charging the defendant with theft and unlawful driving of a vehicle, as that was the same criminal conduct involved in the Oregon prosecution. (*Comingore*, *supra*, 20 Cal.3d at pp. 144, 148-149.)

As construed by this court, the essence of California's statutory double jeopardy prohibition is this: A California prosecution is barred if "all the acts constituting the offense in this state were necessary to prove the offense in the prior [federal or out-of-state] prosecution" (*Belcher*, *supra*, 11 Cal.3d at p. 99); but if the California crime "involves an element not present in the prior prosecution," a California prosecution is not barred (*ibid.*).

With this statutory background in mind, I now turn to this case.

## II

Defendant's murder-for-hire conviction in federal court for the killings of Vera and Gerald Woodman came after a federal indictment alleging that he had "travel[ed] in interstate commerce" between Nevada and California, with the intent to commit murder "in violation of the Penal Code of California" for "the receipt . . . of money" and "result[ing]" in "the deaths of Vera and Gerald Woodman." After that federal conviction, the Los Angeles County District Attorney prosecuted defendant for the same two murders. Defendant contends, as he did in the trial court, that because he had already been convicted in federal

3

court for killing the Woodmans, the California prosecution violated section 656's double jeopardy prohibition. I agree.

The majority, however, rejects defendant's claim, because, unlike the preceding murder-for-hire federal prosecution, the California murder charges against defendant included a lying-in-wait special-circumstance allegation (§ 190.2, subd. (a)(15)). (Maj. opn., *ante*, at p. 27.) The majority is wrong: The California prosecution's allegation of a lying-in-wait special circumstance as to each of the murder counts did not somehow transform each murder count into some different crime with an element not at issue in the earlier federal proceeding so as to allow the California prosecution to avoid application of section 656's prohibition against putting a criminal defendant twice in jeopardy. My reasoning follows.

In California, a conviction for first degree murder is generally punishable by "imprisonment in the state prison for a term of 25 years to life." (§ 190.) Only if at least one special circumstance allegation is found to be true may a punishment of either death or life in prison without the possibility of parole be imposed. (§ 190.2, subd. (a).) The special circumstance statute simply " 'sets forth an alternate penalty' " for the underlying murder. (*People v. Jones* (2009) 47 Cal.4th 566, 576; *People v. Jefferson* (1999) 21 Cal.4th 86, 101.) Rather than being "a complete offense in itself" or a "greater degree" of the murder charge, a special circumstance allegation is nothing more than an "appendage" to that charge. (*People v. Anderson* (2009) 47 Cal.4th 92, 115; *People v. Bright* (1996) 12 Cal.4th 652, 661.)

This court's decisional law that the special circumstance statute is a penalty provision (*People v. Anderson*, *supra*, 47 Cal.4th at pp. 119-120) reflects the California statutory requirement that when a murder prosecution includes a special circumstance allegation, "[t]he question of the defendant's guilt shall be first

4

determined" (§ 190.1, subd. (a)); only after a conviction of murder is the truth of the special circumstance allegation to be determined (*ibid*.; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467). Here, when the question of defendant's guilt of the murders of Vera and Gerald Woodman was put before the jury in the California proceeding, defendant had already been found guilty in federal court of committing those same murders. Prosecuting defendant twice — first in federal court, then in a California court — for those very same killings, violated California's statutory prohibition against twice putting a defendant in jeopardy for the same criminal conduct. (§ 656.) Therefore, the trial court should have granted defendant's motion to dismiss the murder charges against him, and I would reverse that court's judgment.

KENNARD, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Homick

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S044592
**Date Filed:** December 3, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Florence-Marie Cooper

_____

**Counsel:**

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Victoria B. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark E. Cutler
Post Office box 172
Cool, CA  95614-0172
(530) 885-7718

Victoria B. Wilson
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2357